177 P.3d 884

OFFICE OF HAWAIIAN AFFAIRS, Rowena Akana, Haunani Apoliona, Dante Carpenter, Donald Cataluna, Linda Dela Cruz, Colette Machado, Boyd P. Mossman, Oswald Stender, and John Waiheʻe, IV, in their official capacities as members of the Board of Trustees of the Office of Hawaiian Affairs, Pia Thomas Aluli, Jonathan Kamakawiwoʻole Osorio, Charles Kaʻaiʻai, and Keoki Maka Kamaka Kiʻili, Plaintiffs–Appellants,

v.

HOUSING AND COMMUNITY DEVELOPMENT CORPORATION OF HAWAIʻI (HCDCH), Robert J. Hall, in his capacity as Acting Executive Director of HCDCH, Charles Sted, Chair, Stephanie Aveiro, Francis L. Jung, Charles King, Lillian B. Koller, Betty Lou Larson, Theodore E. Liu, Travis Thompson, Taiaopo, Tuimaleialiifano, Members of the Board of Directors of HCDCH, State of Hawaiʻi, and Linda Lingle, in her capacity as Governor, State of Hawaiʻi, Defendants–Appellees.

No. 25570.

Supreme Court of Hawaiʻi.

Jan. 31, 2008.

**180**

Sherry P. Broder, Honolulu, Jon M. Van Dyke, and Melody MacKenzie, on the briefs, for plaintiffs-appellants Office of Hawaiian Affairs.

William Meheula (of Winer Meheula & Devens) and Hayden Aluli, Honolulu, on the briefs, for individual plaintiffs-appellants Aluli, et al.

William J. Wynhoff and Sonia Faust, Deputy Attorneys General, on the briefs, for defendants-appellees.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ.; and Circuit Judge CHAN, in Place of DUFFY, J., Recused.

Opinion of the Court by MOON, C.J.

Two sets of plaintiffs-appellants—(1) the Office of Hawaiian Affairs (OHA) and its Board of Trustees [hereinafter, collectively, the OHA plaintiffs] and (2) Pia Thomas Aluli, Jonathan Kamakawiwoʻole Osorio, Charles Kaʻaiʻai, and Keoki Maka Kamaka Kiʻili [hereinafter, collectively, the individual plaintiffs and, together with the OHA plaintiffs, collectively, the plaintiffs] appeal from the Circuit Court of the First Circuit's January 31, 2003 final judgment,[1] entered pursuant to Hawaiʻi Rules of Civil Procedure (HRCP) Rule 54(b) (2007).[2] Following a jury-waived trial, the trial court found in favor of defendants-appellees State of Hawaiʻi (State), the Housing and Community Development Corporation of Hawaiʻi, and the executive director and members of the board of directors of the HCDCH,[3] as well as Linda Lingle, in her capacity as Governor of the State [hereinafter, collectively, the defendants] and against the plaintiffs.

Briefly stated, the instant action arises from the defendants' efforts in the mid–1990s to transfer certain parcels of ceded lands to private entrepreneurs for the purpose of residential development. On August 11, 1995, the plaintiffs filed suit, seeking an injunction against the defendants from selling or other-

1. The Honorable Sabrina S. McKenna presiding.

2. HRCP Rule 54(b) provides in relevant part that:
 When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

3. Donald K.W. Lau is the executive director of HCDCH, and the board of directors includes chairperson, Wesley R. Segawa, and members Nadine K. Nakamura, Kurt H. Mitchell, Don Fujimoto, Allan Los Banos, Jr., Susan Chandler, Craig Hirai, Ronald S. Lim, and Bradley J. Mossman.

wise transferring to third parties two specific parcels of ceded lands located on the islands of Maui and Hawai'i,[4] as well as any ceded lands from the public lands trust. Alternatively, the plaintiffs sought a declaration that the State was not authorized to alienate ceded lands from the public lands trust or, if the trial court ruled the State was so authorized, a declaration that (2) such alienation would not limit the claims of native Hawaiians to the ceded lands.

On December 5, 2002, the trial court ruled in favor of the defendants, concluding that the plaintiffs' claims were barred by the doctrines of: (1) sovereign immunity; (2) waiver and estoppel; and (3) justiciability—specifically, political question, ripeness, and the mandate against advisory opinions. Nevertheless, the trial court also concluded that the State had the express authority to alienate ceded lands from the public lands trust. An HRCP Rule 54(b) judgment was, thereafter, entered on January 31, 2003, and the plaintiffs appealed.

On appeal, both sets of plaintiffs challenge the aforementioned determinations made by the trial court. Additionally, the OHA plaintiffs assert that the trial court erred in making several evidentiary rulings.

For the reasons discussed *infra*, we vacate the January 31, 2003 judgment and remand this case to the circuit court with instructions to issue an order granting the plaintiffs' request for an injunction against the defendants from selling or otherwise transferring to third parties (1) the parcel of ceded land on Maui and (2) any ceded lands from the public lands trust until the claims of the native Hawaiians to the ceded lands has been resolved.

## I. BACKGROUND

A. *Historical Background*

The issues presented in this case have their genesis in the historical events that led to the overthrow of the Kingdom of Hawai'i, the surrender of 1.8 million acres of crown, government, and public lands to the United States, the admission of Hawai'i as a state of the Union, and the creation of OHA and the public lands trust. *See Office of Hawaiian Affairs v. State*, 110 Hawai'i 338, 340–42, 133 P.3d 767, 769–71 (2006) [hereinafter, *OHA II* ]; *Office of Hawaiian Affairs v. State*, 96 Hawai'i 388, 389–92, 31 P.3d 901, 902–05 (2001) [hereinafter, *OHA I* ]; *Pele Defense Fund v. Paty*, 73 Haw. 578, 585–87, 837 P.2d 1247, 1254–55 (1992); and *Trs. of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 159–65, 737 P.2d 446, 449–53 (1987), *cert. denied*, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 192 (1987); *see also Rice v. Cayetano*, 528 U.S. 495, 501, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).

> As a condition of its admission into the Union, the State of Hawai'i agreed to *hold certain lands granted to the State by the United States in a public land trust for five purposes* [.] *See* Admission Act of March 18, 1959, Pub.L. No. 86–3, § 5, 73 Stat. 4, *reprinted in*, [Hawai'i Revised Statutes (HRS), vol. 1 at § 5 of the Admissions Act].

*OHA I*, 96 Hawai'i at 390, 31 P.3d at 903 (emphasis added). The aforementioned five purposes are specifically delineated in section 5(f) of the Admission Act, which provides in relevant part:

> The lands granted to the State of Hawaii by subsection (b) of this section and public lands retained by the United States under subsections (c) and (d) and later conveyed to the State under subsection (e), together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by said State as a public trust *[ (1) ] for the support of the public schools and [ (2) ] other public educational institutions, [ (3) ] for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amend-*

---

**4.** The plaintiffs filed suit before the parcel on the island of Hawai'i (the Big Island) was transferred. It appears that, at some point, the Big Island parcel [hereinafter, also referred to as the La'i'opua parcel] was transferred to the Department of Hawaiian Homelands (DHHL), which transfer is not specifically challenged by the plaintiffs. Accordingly, other than a few references to the La'i'opua parcel in this opinion, the disposition of the Big Island parcel is not specifically addressed. *See also infra* note 11.

ed,[5] (4) ] for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and [ (5) ] for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought by the United States. (Emphasis added.) The management and administration of the ceded lands subject to the section 5(f) trust, i.e., the public lands trust, is vested in the Department of Land and Natural Resources (DLNR), pursuant to HRS § 171–3 (Supp.2006). See also Pele Defense Fund, 73 Haw. at 586–87, 837 P.2d at 1254. * * *

In 1978, the people of Hawai'i clarified the State's trust obligation to native Hawaiians during a Constitutional Convention, as set forth in various provisions of the Hawai'i

Constitution, including article XII, sections 4 through 6, ... wherein OHA was created and charged with managing proceeds derived from the ceded lands and designated for the benefit of native Hawaiians. Additionally, article XVI, section 7 of the Hawai'i Constitution requires the State to enact legislation regarding its trust obligations. Thus, in 1979, legislation was enacted that set forth the purposes of OHA and described the powers and duties of the trustees.... 1979 Haw. Sess. L. Act 196, § 2 at 398–99, § 8 at 406 (codified at HRS chapter 10)[.] In 1980, the legislature amended HRS chapter 10 by adding HRS § 10–13.5, which provided that "twenty per cent of all funds derived from the public land trust shall be expended by OHA for the purposes of this chapter." ... 1980 Haw. Sess. L. Act 273, § 1 at 525[.6]

OHA II, 110 Hawai'i at 340–41, 133 P.3d at 769–70 (citations, original brackets, and ellipsis omitted) (emphasis in original).[7]

5. The Hawaiian Homes Commission Act was enacted by the United States Congress (Congress) to set aside over 200,000 acres of ceded lands for exclusive homesteading by native Hawaiians. H.R.Rep. No. 839, 66th Cong., 2d Sess. 4 (1920). As a condition of statehood, the United States required the State to adopt the act as a provision of the state constitution, see Hawai'i Const. art. XI, § 2 (1959) (renumbered art. XII, § 2 (1978)); see also Ahuna v. Dep't of Hawaiian Home Lands, 64 Haw. 327, 336–38, 640 P.2d 1161, 1167–68 (1982) (detailing the purpose of the Hawaiian Homes Commission Act and the creation of the Commission).

Although the Hawaiian Homes Commission Act defines the term "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778," HRS, vol. 1 at § 201(7) of the Hawaiian Homes Commission Act, for the purposes of this opinion, we use the term to mean "any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawai'i." Pub.L. No. 103–150, 107 Stat. 1510 (1993).

6. Although not pertinent to the instant appeal, we concluded, in Yamasaki, that the construction of the term "funds," as used in HRS § 10–13.5, "provide[d] no judicially discoverable and manageable standards for resolving the disputes[, i.e., whether OHA was entitled to (1) a portion of damages received by the State for illegal mining of sand from public land and (2) a pro rata share of income and proceeds from sales, leases, or

other dispositions of certain public lands,] and [that the disputes] cannot be decided without initial policy determinations of a kind clearly for nonjudicial discretion." 69 Haw. at 173, 737 P.2d at 457 (citation, internal quotation marks, and original brackets omitted). Consequently, the legislature enacted Act 304, amending HRS § 10–13.5 by essentially substituting "incomes" for "funds" and defining the term "revenue." 1990 Haw. Sess. L. Act 304, §§ 3, 7 at 948, 951; HRS §§ 10–13.5 (1993), 10–2 (1993). However, in OHA I, we invalidated and effectively repealed Act 304 as conflicting with federal law. 96 Hawai'i at 399, 31 P.3d at 912.

7. We observe that the trial court found that, "[i]n recent years, there have been discussions and movement toward the creation of a sovereign Hawaiian government, and this movement has received both state and federal recognition." Some scholars dispute that this movement has been of recent inception, stating instead that, "[e]ver since the illegal overthrow and annexation, the native people of Hawai'i—identified as 'Kanaka Maoli,' 'Native Hawaiians' or 'Hawaiians'—have struggled to regain their culture, recover their lands and restore their sovereign nation." Jon M. Van Dyke & Melody K. Mac-Kenzie, An Introduction to the Rights of Native Hawaiian People, 10–JUL Haw. B.J. 63, 63 (2006) (footnote omitted).

The trial court further found that "various Hawaiian groups support[ ] different forms of sovereignty." However, as observed by one scholar, "[u]ltimately, [n]ative Hawaiians seek return of

Moreover, in 1993, the year that marked the one-hundredth anniversary of the overthrow of the Kingdom of Hawai'i, both houses of Congress passed the *Joint Resolution to Acknowledge the 100th Anniversary of the January 17, 1893 Overthrow of the Kingdom of Hawaii* [hereinafter, the Apology Resolution], which was signed into law by then-President Bill Clinton on November 23, 1993 as Public Law No. 103–150, 107 Stat. 1510 (1993). The Apology Resolution provides, in its entirety, as follows:

Joint Resolution to acknowledge the 100th anniversary of the January 17, 1893 overthrow of the Kingdom of Hawaii, and to offer an apology to [n]ative Hawaiians on behalf of the United States for the overthrow of the Kingdom of Hawaii.

Whereas, prior to the arrival of the first Europeans in 1778, the [n]ative Hawaiian people lived in a highly organized self-sufficient, subsistent social system based on communal land tenure with a sophisticated language, culture, and religion;

Whereas[,] a unified monarchical government of the Hawaiian Islands was established in 1810 under Kamehameha I, the first King of Hawaii;

Whereas, from 1826 until 1893, the United States recognized the independence of the Kingdom of Hawaii, extended full and complete diplomatic recognition to the Hawaiian Government, and entered into treaties and conventions with the Hawaiian monarchs to govern commerce and navigation in 1826, 1842, 1849, 1875, and 1887;

Whereas[,] the Congregational Church (now known as the United Church of Christ), through its American Board of Commissioners for Foreign Missions, sponsored and sent more than 100 missionaries to the Kingdom of Hawaii between 1820 and 1850;

Whereas, on January 14, 1893, John L. Stevens (hereafter referred to in this Resolution as the "United States Minister"), the United States Minister assigned to the sovereign and independent Kingdom of Hawaii conspired with a small group of non-Hawaiian residents of the Kingdom of Hawaii, including citizens of the United States, to overthrow the indigenous and lawful Government of Hawaii;

Whereas, in pursuance of the conspiracy to overthrow the Government of Hawaii, the United States Minister and the naval representatives of the United States caused armed naval forces of the United States to invade the sovereign Hawaiian nation on January 16, 1893, and to position themselves near the Hawaiian Government buildings and the Iolani Palace to intimidate Queen Liliuokalani and her Government;

Whereas, on the afternoon of January 17, 1893, a Committee of Safety that represented the American and European sugar planters, descendents of missionaries, and

[the ceded lands] from both the state and federal governments. How such lands would be cared for and managed, who would have jurisdiction over them, and what rights [n]ative Hawaiians could exercise upon them are crucial aspects of [n]ative Hawaiian self-governance and sovereignty." *Native Hawaiian Rights Handbook,* 40 (Melody Kapilialoha MacKenzie, ed., 1991).

Additionally, we note that the trial court found that the federal legislation commonly referred to as the "Akaka Bill"

was passed out of the Senate Committee on Indian Affairs on September 21, 2001. . . . The Committee Report on the Akaka Bill explains that its purpose "is to authorize a process for the reorganization of a[n]ative Hawaiian government and to provide for the recognition of the [n]ative Hawaiian government by the United States for the purpose of carrying on a government-to-government relationship."

The Akaka Bill, if enacted[,] . . . provides that the federal government is authorized to negotiate with the State and the reorganized [n]ative Hawaiian government for a transfer of land and resources to a[n]ative Hawaiian government. The [n]ative Hawaiian government created by [the Akaka Bill] would thus have a land base and resources and a status similar to that over other native peoples in the United States. The Committee Report to [the Akaka Bill] explains that "it is the Committee's intent that the references to 'land, resources, and assets dedicated to [n]ative Hawaiian use' include, but not be limited to lands set aside under the Hawaiian Homes Commission Act and ceded lands."

The legislation is still pending before the United States Congress.

(Footnotes omitted.) We take judicial notice that the current version of the Akaka Bill was passed by the House of Representatives on October 24, 2007.

financiers deposed the Hawaiian monarchy and proclaimed the establishment of a Provisional Government;

Whereas[,] the United States Minister thereupon extended diplomatic recognition to the Provisional Government that was formed by the conspirators without the consent of the [n]ative Hawaiian people or the lawful Government of Hawaii and in violation of treaties between the two nations and of international law;

Whereas, soon thereafter, when informed of the risk of bloodshed with resistance, Queen Liliuokalani issued the following statement yielding her authority to the United States Government rather than to the Provisional Government:

> I[,] Liliuokalani, by the Grace of God and under the Constitution of the Hawaiian Kingdom, Queen, do hereby solemnly protest against any and all acts done against myself and the Constitutional Government of the Hawaiian Kingdom by certain persons claiming to have established a Provisional Government of and for this Kingdom.
>
> That I yield to the superior force of the United States of America whose Minister Plenipotentiary, His Excellency John L. Stevens, has caused United States troops to be landed at Honolulu and declared that he would support the Provisional Government.
>
> *Now to avoid any collision of armed forces, and perhaps the loss of life, I do this under protest and impelled by said force yield my authority until such time as the Government of the United States shall, upon facts being presented to it, undo the action of its representatives* and reinstate me in the authority which I claim as the Constitutional Sovereign of the Hawaiian Islands.
>
> Done at Honolulu this 17th day of January, A.D. 1893.;

Whereas, without the active support and intervention by the United States diplomatic and military representatives, the insurrection against the Government of Queen Liliuokalani would have failed for lack of popular support and insufficient arms;

Whereas[,] on February 1, 1893, the United States Minister raised the American flag and proclaimed Hawaii to be a protectorate of the United States;

Whereas, the report of a Presidentially established investigation conducted by former Congressman James Blount into the events surrounding the insurrection and overthrow of January 17, 1893, concluded that the United States diplomatic and military representatives had abused their authority and were responsible for the change in government;

Whereas, as a result of this investigation, the United States Minister to Hawaii was recalled from his diplomatic post and the military commander of the United States armed forces stationed in Hawaii was disciplined and forced to resign his commission;

Whereas, in a message to Congress on December ·18, 1893, *President Grover Cleveland reported fully and accurately on the illegal acts of the conspirators, described such acts as an "act of war,* committed with the participation of a diplomatic representative of the United States and without authority of Congress", and acknowledged that by such acts the government of a peaceful and friendly people was overthrown;

Whereas[,] President Cleveland further concluded that a *"substantial wrong has thus been done which a due regard for our national character as well as the rights of the injured people requires we should endeavor to repair"* and called for the restoration of the Hawaiian monarchy;

Whereas[,] the Provisional Government protested President Cleveland's call for the restoration of the monarchy and continued to hold state power and pursue annexation to the United States;

Whereas[,] ·the Provisional Government successfully lobbied the Committee on Foreign Relations of the Senate (hereafter referred to in this Resolution as the "Committee") to conduct a new investigation into the events surrounding the overthrow of the monarchy;

Whereas[,] the Committee and its chairman, Senator John Morgan, conducted

hearings in Washington, D.C., from December 27, 1893, through February 26, 1894, in which members of the Provisional Government justified and condoned the actions of the United States Minister and recommended annexation of Hawaii;

Whereas, although the Provisional Government was able to obscure the role of the United States in the illegal overthrow of the Hawaiian monarchy, it was unable to rally the support from two-thirds of the Senate needed to ratify a treaty of annexation;

Whereas, on July 4, 1894, the Provisional Government declared itself to be the Republic of Hawaii;

Whereas, on January 24, 1895, while imprisoned in Iolani Palace, Queen Liliuokalani was forced by representatives of the Republic of Hawaii to officially abdicate her throne;

Whereas, in the 1896 United States Presidential election, William McKinley replaced Grover Cleveland;

Whereas, on July 7, 1898, as a consequence of the Spanish–American War, President McKinley signed the Newlands Joint Resolution that provided for the annexation of Hawaii;

Whereas, through the Newlands Resolution, the self-declared Republic of Hawaii ceded sovereignty over the Hawaiian Islands to the United States;

Whereas, *the Republic of Hawaii also ceded 1,800,000 acres of crown, government and public lands of the Kingdom of Hawaii, without the consent of or compensation to the [n]ative Hawaiian people of Hawaii or their sovereign government;* [ 8]

Whereas[,] the Congress, through the Newlands Resolution, ratified the cession, annexed Hawaii as part of the United States, and vested title to the lands in Hawaii in the United States;

Whereas[,] the Newlands Resolution also specified that treaties existing between Hawaii and foreign nations were to immediately cease and be replaced by United States treaties with such nations;

Whereas[,] the Newlands Resolution effected the transaction between the Republic of Hawaii and the United States Government;

Whereas[,] *the indigenous Hawaiian people never directly relinquished their claims to their inherent sovereignty as a people or over their national lands to the United States, either through their monarchy or through a plebiscite or referendum;*

Whereas, on April 30, 1900, President McKinley signed the Organic Act that provided a government for the territory of Hawaii and defined the political structure and powers of the newly established Territorial Government and its relationship with the United States;

Whereas, on August 21, 1959, Hawaii became the 50th State of the United States;

Whereas[,] *the health and well-being of the [n]ative Hawaiian people is intrinsically tied to their deep feelings and attachment to the land;*

Whereas[,] the long-range economic and social changes in Hawaii over the nineteenth and early twentieth centuries have been devastating to the population and to the health and well-being of the Hawaiian people; * * *

Whereas[,] *the [n]ative Hawaiian people are determined to preserve, develop and transmit to future generations their ancestral territory, and their cultural identity in accordance with their own spiritual and traditional beliefs, customs, practices, language, and social institutions;*

Whereas, in order to promote racial harmony and cultural understanding, the Legislature of the State of Hawaii has deter-

---

8. As this court stated in *OHA I*:

In addition to its sovereignty, the Republic "ceded and transferred to the United States the absolute fee and ownership of all public, Government, or Crown lands belonging to the Government of the Hawaiian Islands together with every right and appurtenance thereunto appertaining." *Yamasaki*, 69 Haw. at 159, 737 P.2d

at 449. Following annexation and until 1959, Hawaii's seat of power was vested in a Territorial Government. *See* Organic Act § 3, Act of April 30, 1990, c. 339, 31 Stat. 141, *reprinted in* [HRS, vol. 1 at §§ ] 43, 44 [of the Organic Act] (establishing the government of the Territory of Hawai'i).

96 Hawai'i at 389–90, 31 P.3d at 902–03.

mined that the year 1993 should serve Hawaii as a year of special reflection on the rights and dignities of the [n]ative Hawaiians in the Hawaiian and the American societies;

Whereas[,] the Eighteenth General Synod of the United Church of Christ in recognition of the denomination's historical complicity in the illegal overthrow of the Kingdom of Hawaii in 1893 directed the Office of the President of the United Church of Christ to offer a public apology to the [n]ative Hawaiian people and to initiate the process of reconciliation between the United Church of Christ and the [n]ative Hawaiians; and

Whereas[,] *it is proper and timely for the Congress on the occasion of the impending one hundredth anniversary of the event, to acknowledge the historic significance of the illegal overthrow of the Kingdom of Hawaii, to express deep regret to the [n]ative Hawaiian people, and to support the reconciliation efforts of the State of Hawaii and the United Church of Christ with [n]ative Hawaiians:* Now, therefore, be it

Resolved by the Senate and House of Representatives of the United State of American in Congress assembled,

SECTION 1. *ACKNOWLEDGEMENT AND APOLOGY.*

The Congress—

(1) on the occasion of the 100th anniversary of the illegal overthrow of the Kingdom of Hawaii on January 17, 1893, *acknowledges the historical significance of this event which resulted in the suppression of the inherent sovereignty of the [n]ative Hawaiian people;*

(2) recognizes and commends the efforts of reconciliation initiated by the State of Hawaii and the United Church of Christ with [n]ative Hawaiians;

(3) *apologizes to [n]ative Hawaiians* on behalf of the people of the United States *for the overthrow of the Kingdom of Hawaii on January 17, 1893* with the participation of agents and citizens of the United States, *and the deprivation of the rights of [n]ative Hawaiians to self-determination;*

(4) expresses its commitment to acknowledge the ramifications of the overthrow of the Kingdom of Hawaii, *in order to provide a proper foundation for reconciliation between the United States and the [n]ative Hawaiian people;* and

(5) urges the President of the United States to also acknowledge the ramifications of the overthrow of the Kingdom of Hawaii and to support reconciliation efforts between the United States and the [n]ative Hawaiian people.

SEC[TION] 2. DEFINITIONS.

As used in this Joint Resolution, the term "[n]ative Hawaiian" means any individual who is a descendent of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

SEC[TION] 3. DISCLAIMER.

*Nothing in this Joint Resolution is intended to serve as a settlement of any claims against the United States.*

Approved November 23, 1993.

Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510 (emphases added) (internal quotation marks omitted).

B. *Factual Background*

In 1987, the legislature, in an effort to remedy the problem of the "critical shortage of safe and sanitary housing units which are affordable to lower income residents of the State[,]" established the Housing Finance and Development Corporation (HFDC) [9] via its enactment of HRS chapter 201E. 1987 Haw. Sess. L. Act 337, § 15 at 1045; HRS

---

9. In 1997, the legislature consolidated HFDC with the Hawaiʻi Housing Authority and the rental housing trust fund into the Housing and Community Development Corporation of Hawaii (HCDCH). 1997 Haw. Sess. L. Act 350, § 1 at 1010–11; HRS chapter 201G (2001). However, the legislature, in 2006, divided HCDCH into two separate agencies—the Hawaiʻi Housing Finance and Development Corporation and the Hawaiʻi

Public Housing Authority. *See* 2006 Haw. Sess. L. Act 180, § 2 at 709; 2007 Haw. Sess. L. Act 249, § 2 at 777–806 (codified in HRS chapters 201H and 356D). Nevertheless, inasmuch as the instant action commenced prior to the aforementioned legislative changes, we continue to utilize "HFDC," as do the parties, throughout this opinion.

§§ 201E–1 and –3 (1993). HFDC was authorized to, *inter alia,* develop

> fee simple or leasehold property, construct dwelling units thereon, including condominiums, planned units, and cluster developments, and sell, lease, or rent or cause to be leased or rented, at the lowest possible price to qualified residents, nonprofit organizations, or government agencies, with an eligible developer or in its own behalf, either:
>
> (1) Fully completed dwelling units with the appropriate interest in the land on which the dwelling unit is located; or
>
> (2) Units which are substantially complete and habitable with the appropriate interest in the land on which the dwelling unit is located; or
>
> (3) The land with site improvements (other than the dwelling unit) either partially or fully developed.

HRS § 201E–201(a) (1993). Consequently, that same year, 1987, the HFDC began to examine areas in the State that had a "critical shortage of housing" and selected two potential sites—(1) Leialiʻi in West Maui and (2) Laʻiʻopua in North Kona,[10] both of which were comprised of ceded lands[11]—for the development of housing projects.

After conducting feasibility studies of the potential sites, the HFDC filed a petition with the Land Use Commission (LUC) in December 1989, seeking to reclassify the Leialiʻi parcel from agricultural to urban use. At a public hearing on April 10, 1990, OHA, through its Land and Natural Resources Officer, gave oral testimony recommending conditional approval of the petition. On May 18, 1990, the LUC granted the petition, reclassifying the property for urban use. Thereafter, HFDC began a residential housing development project for the parcel. As the "Master Developer" for the Leialiʻi project, HFDC was responsible for providing the major infrastructure, *i.e.,* roadways, lighting poles, and sewer hook-ups, needed for the residential development. HFDC contracted with a private developer to build the houses.

In 1992, the legislature enacted Act 318 (codified as HRS § 10–13.6 (1993)) that set forth a formula to compensate OHA for the "villages of Leialiʻi, Maui and villages of Laʻiʻopua, Hawaiʻi" that were to be conveyed from DLNR to HFDC. HRS § 10–13.6(e) (Supp.2007); *see also* 1992 Haw. Sess. L. Act 318, § 10 at 1016–17. According to Act 318's formula, OHA was to be compensated twenty per cent of the fair market value of the subject lands. HRS § 10–13.6(a). As a result, OHA and DLNR each retained an appraiser to determine the fair market value of the Leialiʻi parcel.

In November 1993, Congress adopted the Apology Resolution, quoted fully *supra* and discussed more fully *infra,* wherein it expressly recognized, *inter alia,* that: (1) the overthrow of the Kingdom of Hawaiʻi was illegal; (2) the taking of crown, government, and public lands of the Kingdom was without consent or compensation; and (3) "the indigenous Hawaiian people never directly relinquished their claims ... over their national lands to the United States." Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510. Congress also formally and publicly apologized to native Hawaiians on behalf of the United States for the overthrow and the deprivation of native Hawaiians' rights to self-determination. *Id.* Thereafter and as a result of the adoption of the Apology Resolution, OHA demanded, based on the advice of attorney William Meheula, that a disclaimer be included as a part of any acceptance of funds from the sale so as to preserve any native Hawaiian claims to ownership of the ceded lands, of which the Leialiʻi parcel was a part.

In October 1994, HFDC declined to honor OHA's requested disclaimer because "to do so would place a cloud on [the] title, rendering title insurance unavailable to buyers in the Lealiʻi [sic] project." Thereafter, on No-

---

10. As stated *supra* note 5, other than a few references to the Laʻiʻopua parcel in this opinion, the transfer of said parcel is not specifically challenged by the plaintiffs. Moreover, the parties' briefs and arguments focus primarily on the Leialiʻi parcel and the ceded lands in general.

11. The Leialiʻi parcel was part of the former crown lands subject to subsection 5(b) of the Admission Act.

vember 4, 1994, "DLNR transferred about 500 acres of ceded lands" at Leiali'i to HFDC for the consideration of $1.00. HFDC transmitted to OHA a check in the amount of $5,573,604.40 as OHA's entitlement in accordance with Act 318. Based on advice from then-OHA counsel Earl Anzai that the Apology Resolution created a cloud on the title of the ceded lands, OHA refused to accept the check. The plaintiffs thereafter filed suit in November 1994.

Subsequent to the filing of the plaintiffs' lawsuit, the HFDC made a policy decision to stop work on the project. By that time, all of the roadways, utilities, lighting poles, and sewer hookups had been completed, including some landscaping work. As of December 1994, HFDC estimated it had already invested $31 million into the Leiali'i project.

## C. *Procedural History*

### 1. The Complaint and Pretrial Motions

On August 11, 1995, the plaintiffs filed an amended complaint (First Amended Complaint), seeking injunctive and, alternatively, declaratory relief.[12] The plaintiffs requested: (1) an injunction against all sales of ceded lands (Count I); (2) an injunction to specifically bar the sale of the Leiali'i parcel (Count II); and, alternatively, (3) a declaratory judgment that "(a) any conveyance to a third-party violates the Hawai'i State Constitution and the Admission Act, and/or (b) any sale of ceded lands does not directly or indirectly release or limit claims of [n]ative Hawaiians to those lands" (Count III).[13] The plaintiffs alleged that they would suffer irreparable harm if the defendants were allowed to transfer ceded lands to third-parties inasmuch as "alienation of the land to a

third-party would erode the ceded lands trust and the entitlements of the native Hawaiian people." In other words, the plaintiffs alleged that an injunction was proper because, in light of the Apology Resolution, any transfer of ceded lands by the State to third-parties would amount to a breach of trust inasmuch as such transfers would be "without regard for the claims of Hawaiians to those lands" to whom the State, as trustee, owes a fiduciary duty.

### 2. The Trial and the Trial Court's Written Decision

A jury-waived trial commenced on November 19, 2001. At trial, the plaintiffs adduced evidence regarding the events that surrounded the transfer of the Leiali'i parcel, the importance of the land to the native Hawaiians, analogies to Native American property rights, and the developing body of international law that favors the rights of indigenous people to traditional lands. The defendants primarily adduced evidence that the State was authorized to alienate ceded lands from the public lands trust. Additionally, the defendants argued that the plaintiffs were collaterally estopped "from even arguing that the State does not have the power to sell [the ceded lands]" based on the unpublished decision in *Trustees of the Office of Hawaiian Affairs v. Board of Land and Natural Resources*, No. 19774, 87 Hawai'i 471, 959 P.2d 841 (Haw. Mar.12, 1998) (mem.) [hereinafter, *Ewa Marina* ],[14] wherein this court held that the State, as ceded lands trustee, did not breach its duties by granting a dredge permit for submerged lands to a private party, discussed more fully *infra*.

---

12. Initially, the plaintiffs filed separate complaints. On November 4, 1994, the OHA plaintiffs filed a complaint in the Circuit Court of the First Circuit. On November 9, 1994, the individual plaintiffs filed a complaint in the Circuit Court of the Second Circuit. Upon the filing of the First Amended Complaint in August 1995, the individual plaintiffs and allegations pertaining to their claims were added to those of the OHA plaintiffs in the First Circuit Court action.

13. In their First Amended Complaint, the plaintiffs asserted two other alternative claims that addressed valuation issues concerning the Leia-

li'i parcel (Counts IV and V). However, these counts were bifurcated from the case for later determination and are not at issue in this appeal. Counts IV and V are currently stayed pending this appeal.

14. As correctly cited by the trial court, Hawai'i Rules of Appellate Procedure (HRAP) Rule 35(c)(2007) prohibits citation to an unpublished memorandum opinion, "except when the opinion or unpublished dispositional order establishes the law of the pending case, res judicata or collateral estoppel[.]"

On December 5, 2002, the trial court issued a 105-page written decision, entitled "Opinion of the Court" [hereinafter, the written decision]. As discussed more fully *infra*, the trial court ruled that, although *Ewa Marina* did not collaterally estop the plaintiffs from bringing their claims, such claims were barred by the doctrines of: (1) sovereign immunity; (2) waiver and estoppel; and (3) justiciability—specifically, political question, ripeness, and the mandate against advisory opinions. Notwithstanding the above rulings, the trial court also concluded that the State had the express authority to alienate ceded lands from the public lands trust.

On December 13, 2002, the plaintiffs filed a motion for HRCP Rule 54(b) certification or, in the alternative, for leave to file an interlocutory appeal, which was granted. The trial court, on January 31, 2003, filed its HRCP Rule 54(b) judgment in favor of the defendants. Both sets of plaintiffs separately filed timely notices of appeal on February 3, 2003.

## II. STANDARDS OF REVIEW

### A. Findings of Fact

The [trial court's findings of fact] are reviewed on appeal under the "clearly erroneous" standard. A [finding of fact] is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Estate of Klink ex rel. Klink v. State*, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007) (citations, internal quotation marks, original brackets, and ellipses omitted) (format altered).

### B. Conclusions of Law

This court reviews the [trial court's conclusions of law] *de novo*. A [conclusion of law] is not binding upon an appellate court and is freely reviewable for its correctness. Moreover, a [conclusion of law] that is supported by the [trial court's finding of facts] and that reflects an application of the correct rule of law will not be overturned.

*Hui Kako'o Aina Ho'opulapula v. Bd. of Land & Natural Res.*, 112 Hawai'i 28, 38, 143 P.3d 1230, 1240 (2006) (citations, internal quotation marks, and original brackets omitted).

## III. DISCUSSION

As previously stated, the plaintiffs seek to enjoin the defendants from selling or otherwise transferring the Leiali'i parcel to third parties and selling or otherwise transferring to third parties any of the ceded lands in general until a determination of the native Hawaiians' claims to the ceded lands is made. Alternatively, the plaintiffs seek a declaration that the State is not authorized to alienate ceded lands from the public lands trust or, if the trial court ruled that the State is so authorized, a declaration that such alienation would not limit the claims of native Hawaiians to the ceded lands. At the heart of the plaintiffs' claims, before the trial court and on appeal, is the Apology Resolution. The plaintiffs essentially believe that the title to the ceded lands is clouded as a result of the Apology Resolution's recognition that the native Hawaiian people never relinquished their claims over their ancestral territory and that, therefore, the defendants have a "fiduciary obligation to protect the corpus of the [p]ublic [l]ands [t]rust until an appropriate settlement is reached between native Hawaiians and the State."

Specifically, the plaintiffs argue that the trial court erred in concluding that: (1) the doctrine of sovereign immunity barred consideration of the plaintiffs' claims; (2) the defenses of waiver and estoppel barred the plaintiffs' requests for injunctive and declaratory relief with respect to the sale of the Leiali'i parcel; (3) the State's transfer of the Leiali'i parcel did not breach—and any future transfer of ceded lands would not breach—the State's fiduciary duties as trustee of the public lands trust of which the ceded lands are a part; and (4) the doctrine of political question barred the plaintiffs' requests for injunctive and declaratory relief.

Additionally, the OHA plaintiffs assert that the trial court erred in: (1) determining that their claim for injunctive relief with regard to the future sale of ceded lands in general was barred by the ripeness doctrine; and (2) making several evidentiary rulings.

Preliminarily, we believe it appropriate to first examine the language of the Apology Resolution inasmuch as the plaintiffs' current claim for injunctive relief is, as more fully described *infra*, based largely upon the Apology Resolution, which the defendants believe is inapplicable. We also believe it appropriate to examine related state legislation enacted around the same time that Congress adopted the Apology Resolution. In our view, this preliminary examination is critical to an understanding of the plaintiffs' claim for injunctive relief.

## A. *The Apology Resolution and Related State Legislation*

The plaintiffs' claims for injunctive relief and, alternatively, for declaratory relief, are based on their belief that the "recognition in[, *inter alia,* the Apology Resolution] of the illegality of the transfer of lands and the ongoing reconciliation and negotiation process dramatically reinforces the State's fiduciary obligation to protect the corpus of the [p]ublic [l]ands [t]rust until an appropriate settlement is reached." Specifically, the OHA plaintiffs argue that the "Congressional recognition of illegality, and its accompanying call for a 'reconciliation' through a process now underway, has changed the legal landscape and restructured the rights and obligations of the State." The OHA plaintiffs further assert that

> the failure of the Apology Resolution to complete the process of settling [n]ative Hawaiian claims does not undercut its significance *in recognizing the bases for [the plaintiffs'] claims.* ... As the [trial c]ourt explained, the Apology Resolution "confirms the factual foundation for the claims that previously had been asserted."

(Emphasis added.) Additionally, the OHA plaintiffs maintain that the "Apology Resolution by itself does not require the State to turn over the lands to the [n]ative Hawaiian people, but it puts the State on notice that it must carefully preserve these lands so that a subsequent transfer can take place when the political branches reach an appropriate resolution of this dispute."

The defendants admit that the Apology Resolution "posits that the overthrow was illegal and that the [c]eded [l]ands were transferred without compensation." However, relying on the disclaimer language contained therein, the defendants assert that "nothing in the Apology Resolution serves as a settlement of claims." Additionally, the defendants maintain that the Apology Resolution's "historical statements provide no guideline as to what remedy, if any, is appropriate."

The trial court, in analyzing the effect of the Apology Resolution on the plaintiffs' claims, stated:

> The Apology Resolution apologizes for the overthrow of the Kingdom of Hawai'i on January 17, 1893, with the participation of agents and citizens of the United States, and for the deprivation of the inherent rights of native Hawaiians to self-determination and sovereignty. It also supports, recognizes, and commends reconciliation efforts of the State of Hawai'i with native Hawaiians. *Congress concluded in this enactment of the Apology Resolution, which is binding upon this court, that the overthrow of the Kingdom of Hawai'i was in violation of treaties between the Kingdom and the United States and of international law, that it could not have been accomplished without the assistance of U.S. agents, and that the subsequent "cession" of these lands to the United States in 1898 was "without the consent of or compensation to the [n]ative Hawaiian people of Hawai'i or their sovereign govern-ment[.]"*
>
> ....
>
> Congress also expressed its commitment to acknowledge the ramifications of the overthrow of the Kingdom of Hawai'i in order to provide a proper foundation for reconciliation between the United States and the [n]ative Hawaiian [p]eople, and urged the President of the United States to also acknowledge the ramifications and to support reconciliation efforts.

*Although, by its terms, the 1993 Apology Resolution does not itself "serve as a settlement of any claims against the United States," or "result in any changes in existing law,"* [S.Rep. No. 103–123 (1993) at 35,] *or itself create a claim, right, or cause of action, [Rice v. Cayetano, 941 F.Supp. 1529, 1546 n. 24 (D.Haw.1996), rev'd on other grounds, 528 U.S. 495 [120 S.Ct. 1044, 145 L.Ed.2d 1007] (2000),] it confirms the factual foundation for claims that previously had been asserted.*

(Emphases added.) (Footnotes omitted.)

■ As previously stated, the Apology Resolution was adopted by both the House and the Senate, signed by then-President Clinton on November 23, 1993, and designated as Public Law No. 103–150. Generally, when a joint resolution—such as the one at issue in this case—has emerged from legislative deliberations and proceedings, it is treated as law. *Ann Arbor R. Co. v. United States,* 281 U.S. 658, 666, 50 S.Ct. 444, 74 L.Ed. 1098 (1930). Consequently, the rules applicable to statutory interpretation are also applicable to the Apology Resolution. Norman J. Singer, *Statutes and Statutory Construction* § 29:8 (6th ed.2002); 82 C.J.S. *Statutes* § 306 (2007).

■ It is well-settled that,

[w]hen construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And *we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.*

*Coon v. City & County of Honolulu,* 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002) (emphasis added) (citation omitted). Additionally, "the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Keliipuleole v. Wilson,* 85 Hawai'i 217, 222, 941 P.2d 300, 305 (1997) (internal brackets and citations omitted). In other words, "a rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable or impracticable[.]" *Id.* at 221–22, 941 P.2d at 304–05 (internal brackets and citation omitted). Moreover,

[i]t is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all the words of the statute.

*Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984) (citations omitted).

As previously quoted, the Apology Resolution states in relevant part:

Whereas[,] *the Republic of Hawaii also ceded 1,800,000 acres of crown, government and public lands of the Kingdom of Hawaii, without the consent of or compensation to the [n]ative Hawaiian people of Hawaii or their sovereign government;*

. . .;

Whereas[,] *the indigenous Hawaiian people never directly relinquished their claims to their inherent sovereignty as a people or over their national lands to the United States, either through their monarchy or through a plebiscite or referendum;*

. . .;

Whereas[,] *the health and well-being of the [n]ative Hawaiian people is intrinsically tied to their deep feelings and attachment to the land;*

. . .; [and]

Whereas[,] *the [n]ative Hawaiian people are determined to preserve, develop and transmit to future generations their ancestral territory, and their cultural identity in accordance with their own spiritual and traditional beliefs, customs, practices, language, and social institutions* [.]

Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510 (emphases added). Based on a plain reading of the above passages, we believe Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands, which were taken without consent or compensation and which the native Hawaiian people are determined to preserve, develop, and transmit to future generations. Equally clear is

Congress's "express[ed] . . . commitment to acknowledge the ramifications of the overthrow of the Kingdom of Hawaii, in order to *provide a proper foundation for reconciliation* between the United States and the [n]ative Hawaiian people." *Id.* We agree with the OHA plaintiffs that the "Apology Resolution by itself does not require the State to turn over the [ceded] lands to the [n]ative Hawaiian people[.]" In our view, the Apology Resolution acknowledges only that unrelinquished claims exist and plainly contemplates future reconciliation with the United States and the State with regard to those claims.

■ The defendants place great reliance on the Apology Resolution's disclaimer that "[n]othing in [the resolution] is intended to serve as a settlement of any claims against the United States." Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510. In so doing, they essentially maintain that the plaintiffs are precluded from using the language contained therein to establish or support a claim for the return of the ceded lands. When reading the disclaimer language—as we must—"in the context of the entire [Apology Resolution] and constru[ing] it in a manner consistent with its purpose," *Coon,* 98 Hawai'i at 245, 47 P.3d at 360, the disclaimer provision dictates only that the Apology Resolution itself does not constitute a settlement of any of the unrelinquished claims to the ceded lands; in other words, it does not bestow upon native Hawaiians any *ownership interest* in the ceded lands. As we have stated, the Apology Resolution recognizes, *inter alia,* that native Hawaiians (1) never "directly relinquished their claims to . . . their national lands to the United States" and (2) "are determined to preserve, develop and transmit to future generations their ancestral territory." If we were to determine, as the defendants appear to urge, that the

disclaimer bars the plaintiffs from relying upon the Apology Resolution—a public law—in pursuing what the resolution clearly recognizes—their unrelinquished claims to the ceded lands,—we would be violating one of the cardinal rules of statutory construction, namely, that this court is bound "to give effect to all parts of a statute" so that "no clause, sentence, or word shall be construed as superfluous, void, or insignificant." *Camara,* 67 Haw. at 215, 685 P.2d at 797. Subscribing to the defendants' reading of the disclaimer would render superfluous the Apology Resolution's acknowledgment of the plaintiffs' unrelinquished claims to the ceded lands. In fact, given the Apology Resolution's clear contemplation of future reconciliation, *i.e.,* settlement, it is not surprising that Congress would include the aforementioned disclaimer after having clearly acknowledged the illegality of the overthrow, the existence of the native Hawaiians' unrelinquished claims to the ceded lands, their deep feelings and attachment to those lands, and their determination to pursue their claims. Clearly, the Apology Resolution is not *per se* a *settlement* of claims, but serves as the *foundation* (or starting point) for reconciliation, including the future settlement of the plaintiffs' unrelinquished claims.

Such interpretation is supported by the October 23, 2000 report, issued by the United States Departments of Interior and Justice (the Departments), entitled "From Mauka to Makai: The River of Justice Must Flow Freely." [15] As indicated by the trial court, the principal recommendation of the report states:

It is evident from the documentation, statements, and views received during the reconciliation process undertaken by [the Departments] pursuant to [the Apology Resolution], that [n]ative Hawaiian people continue to maintain a distinct community

15. In March 1999, Senator Daniel K. Akaka requested Secretary of the Interior Bruce Babbitt and Attorney General Janet Reno designate officials from their respective Departments whose task would be "to commence the reconciliation process." John Berry, Assistant Secretary, and Mark Van Norman, Director of the Office of Tribal Justice for the Department of Justice were so designated and commenced public consultations in Hawai'i in December 1999. Over forty

hours of public statements were heard, and the public consultation process ended in two days of formal hearings on O'ahu. The Departments' report "contains recommendations [ (including a 'proposed plan of action') ] with respect to the continuation of the reconciliation process and should be read as merely the next step, as the United States and [n]ative Hawaiians move forward in further dialogue."

and certain governmental structures and they desire to increase their control over their own affairs and institutions. *As [a] matter of justice and equity, this report recommends that [n]ative Hawaiian people should have self-determination over their own affairs within the framework of [f]ederal law,* as do Native American tribes. For generations, the United States has recognized the rights and promoted the welfare of [n]ative Hawaiians as an indigenous people within our nation through legislation, administrative action, and policy statements. *To safeguard and enhance [n]ative Hawaiian self-determination over their lands, cultural resources, and internal affairs, the Departments believe Congress should enact further legislation* to clarify [n]ative Hawaiians' political status and to create a framework for recognizing a government-to-government relationship with a representative [n]ative Hawaiian governing body.

(Format altered.) (Emphases added.)

The above interpretation is also supported by related state legislation enacted at around or subsequent to the adoption of the Apology Resolution—specifically, Acts 354, 359, 329, and 340. Act 354, entitled "A Bill for an Act Relating to Hawaiian Sovereignty," stated in pertinent part that:

On January 16, 1893, John L. Stevens, American minister in Hawai'i and friend of those supporting the annexation of Hawai'i to the United States, ordered the United States marines to invade Honolulu under the pretext of protecting American citizens and their property. Stevens thereafter recognized a new provisional government even before Queen Liliuokalani surrendered. The actions by the annexationists were condemned by President Cleveland's special envoy and the President himself. When President Cleveland refused to submit a treaty of annexation to the Senate, the new provisional government established the Republic of Hawai'i which lasted until annexation in 1898. Sixty-one years later, Hawai'i became a state.

Until the provisional government was recognized by John L. Stevens, the Kingdom of Hawai'i was recognized as an inde-

pendent nation by the United States, France, and Great Britain. Many native Hawaiians and others view the overthrow of 1893 and subsequent actions by the United States, such as supporting establishment of the provisional government and later the Republic of Hawai'i, the designation of the crown and government lands as public lands, annexation, and the ceding of the public lands to the federal government without the consent of native Hawaiians, as illegal. *Because the actions taken by the United States were viewed as illegal and done without the consent of native Hawaiians, many native Hawaiians feel there is a valid legal claim for reparations. Many native Hawaiians believe that the lands taken without their consent should be returned* and if not, monetary reparations made, and that they should have the right to sovereignty, or the right to self-determination and self-government as do other native American peoples.

*The legislature has also acknowledged that the actions by the United States were illegal and immoral, and pledges its continued support to the native Hawaiian community by taking steps to promote the restoration of the rights and dignity of native Hawaiians.*

1993 Haw. Sess. L. Act 354, § 1 at 999–1000 (emphases added). In Act 359, also entitled "A Bill for an Act Relating to Hawaiian Sovereignty," the legislature made findings similar to those expressed in the Apology Resolution. 1993 Haw. Sess. L. Act 359, §§ 1–2 at 1009–11. The stated purpose of Act 359 was to "facilitate the efforts of native Hawaiians to be governed by an indigenous sovereign nation of their own choosing." 1993 Haw. Sess. L. Act 359, § 2 at 1010. The legislature established the Hawaiian Sovereignty Advisory Commission "to advise the legislature in carrying out the purposes of [the] Act." *Id.,* § 4 at 1011. In enacting Acts 354 and 359, the legislature recognized that "the indigenous people of Hawai'i were denied ... their lands," 1993 Haw. Sess. L. Act 359, § 1(9) at 1010, and contemplated further action by the legislature to "to tak[e] steps to promote the restoration of the rights

and dignity of native Hawaiians." 1993 Haw. Sess. L. Act 354, § 1 at 1000.

In 1997, the legislature enacted Act 329. 1997 Haw. Sess. L. Act 329, § 1 at 956–58. Act 329, which attempted to clarify "the proper management and disposition of the lands subject to the public land[s] trust and the proceeds and income therefrom, and to effectuate article XII, section 6 of the Hawai'i Constitution," stated that:

> The legislature finds that the events of history relating to Hawai'i and [n]ative Hawaiians, including those set forth in [the Apology Resolution] continue to contribute today to a deep sense of injustice among many [n]ative Hawaiians and others. *The legislature recognizes that the lasting reconciliation so desired by all people of Hawai'i is possible only if it fairly acknowledges the past while moving into Hawaii's future.*
>
> The legislature further finds that over the last few decades, *the people of Hawai'i through amendments to their state constitution, the acts of their legislature, and other means, have moved substantially toward this permanent reconciliation.* Foremost among these achievements have been the creation of the [O]ffice of Hawaiian [A]ffairs and the allocation by legislative action to the [O]ffice of Hawaiian [A]ffairs of substantial funds out of a portion of the public land[s] trust established by section 5(f) of the Admission Act. The overriding purpose of this Act is to continue this momentum, through further executive and legislative action in conjunction with the people of Hawai'i, *toward a comprehensive, just, and lasting resolution.*

1997 Haw. Sess. L. Act 329, § 1 at 956 (emphases added).

Additionally, we observe that, in 1993, the legislature found that "the island of Kaho'olawe[16] is of significant cultural and historic importance to the native people of Hawai'i," 1992 Haw. Sess. L. Act 340, § 1 at 803, and dictated that:

> Upon ... return [of Kaho'olawe] to the State, the resources and waters of Kaho'olawe shall be held in trust as part of the public lands trust; provided that the State shall transfer management and control of the island and its waters to the sovereign native Hawaiian entity upon its recognition by the United States and the State of Hawai'i.

*Id.* at § 2 at 806 (codified as HRS chapter 6K).

It is well-settled that native Hawaiian beneficiaries of the ceded lands trust have a "right to bring suit under the Hawai'i Constitution to prospectively enjoin the State from violating the terms of the ceded lands trust." *Pele Defense Fund,* 73 Haw. at 601, 837 P.2d at 1262. Moreover, we have previously indicated in an analogous case dealing with the Hawaiian Homes Commission Act that the State, as trustee, "must adhere to high fiduciary duties normally owed by a trustee to its beneficiaries." *Ahuna,* 64 Haw. at 338, 640 P.2d at 1168. In describing the scope of the State's relevant fiduciary duties, this court, in *Ahuna,* analogized such duties to the fiduciary duties of the United States to native Americans by quoting, with approval, the words of the United States Supreme Court and stated:

> Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, [the Government] has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards.

*Id.* at 339, 640 P.2d at 1169 (quoting *Seminole Nation v. United States,* 316 U.S. 286, 296–97, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942)) (brackets and emphases in original) (format

---

16. The island of Kaho'olawe was used by the United States "as a military target range since 1941." 1993 Haw. Sess. L. Act 340, § 1 at 803. In 1990, the bombing and shelling of the island was halted by Congress and the President of the United States. A federal commission, known as the Kaho'olawe Island Conveyance Commission, was created by Congress to determine the terms of conveyance of the island to the State of Hawai'i. *Id.*

altered). In *Ahuna*, we held that "[t]he use of the term 'most exacting fiduciary standards' imports the notion that [this] court will strictly scrutinize the actions of the government." *Id.* at 339, 640 P.2d at 1169. Moreover, we observed that "the nature of the trust obligations of the [State] toward beneficiaries ... may be determined by examining well-settled principles enunciated by the federal courts regarding lands set aside by Congress in trust for the benefit of other native Americans[.]" *Id.* at 339, 640 P.2d at 1168. In particular, we cited three specific trust duties applicable to the State as trustee: (1) "the obligation ... to administer the trust solely in the interest of the beneficiary"; (2) the obligation that the trustee "deal impartially when there is more than one beneficiary"; and (3) the "obligation to use reasonable skill and care to make trust property productive[.]" [17] *Id.* at 340, 640 P.2d at 1169–70 (citations omitted).

As native Hawaiians, the individual plaintiffs are clearly beneficiaries of the ceded lands trust. Additionally, OHA, which is charged "with managing proceeds derived from the ceded lands and designated for the benefit of native Hawaiians," *OHA II*, 110 Hawai'i at 341, 133 P.3d at 770 (citation omitted), can be said to be representing the interests of the native Hawaiian beneficiaries to the ceded lands trust. The State, as trustee, is under an obligation to "administer the trust solely in the interest of the beneficiary" and to "deal impartially when there is more than one beneficiary." *Ahuna*, 64 Haw. at 340, 640 P.2d at 1169–70 (citations omitted). As previously discussed, the Apology Resolution and the aforementioned related state legislation clearly contemplate that native Hawaiians (1) "never directly relinquished their claims to ... their national lands to the United States," and (2) "are determined to preserve, develop and transmit to future generations their ancestral territory." Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510. As such, we believe and, therefore, hold that the Apology Resolution and related state legislation, discussed *supra*, give rise to the State's fiduciary duty to preserve the corpus of the public lands

trust, specifically, the ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved. Such duty is consistent with the State's "obligation to use reasonable skill and care" in managing the public lands trust and the *Ahuna* court's declaration that the State's conduct "should ... be judged by the most exacting fiduciary standards." *Ahuna*, 64 Haw. at 339, 640 P.2d at 1169 (citations and emphasis omitted).

Keeping the aforementioned discussion and holding in mind, we now turn to examine the issues raised by the parties in this appeal—the first of which is the defendants' contention that the plaintiffs' claim for injunctive relief is barred by the doctrine of collateral estoppel.

### B. *Collateral Estoppel*

Relying on *Ewa Marina*, the defendants assert, as they did before the trial court, that the plaintiffs are collaterally estopped from relitigating whether the State has the power to alienate ceded lands from the public lands trust. The OHA plaintiffs maintain that the trial court addressed the issue and "correctly rejected the argument presented by the [defendants]."

In *Ewa Marina*, the plaintiffs—OHA, Save Ewa Beach Ohana, and two individual plaintiffs—challenged the Board of Land and Natural Resources' (BLNR) issuance of a conservation district use area (CDUA) permit to Haseko, Inc. (Haseko). *Ewa Marina*, slip op. at 2. "Haseko submitted a CDUA permit application to the BLNR[,] seeking a permit to dredge a channel through state-owned submerged lands. The purpose of this permit was to allow Haseko to construct a 1400-slip marina as part of the proposed 'Ewa Marina development project." *Id.* BLNR conditionally granted Haseko's application for the CDUA permit on December 29, 1994. *Id.* at 8. The plaintiffs timely appealed the decision and order of the BLNR to the circuit court, which affirmed the decision of the BLNR. *Id.* at 8–9. The plaintiffs then appealed to this court, arguing, *inter alia*, that

---

**17.** In so doing, we stated that the "reasonable prudent person standard applies to protecting and caring for the [trust] property[.]" *Ahuna*, 64 Haw. at 340, 640 P.2d at 1169.

"the issuance of the permit violated the fiduciary obligations of the State of Hawai'i under section 5(f) of the ... Admission Act and the public trust doctrine" and that "issuance of the permit constitute[d] an improper disposition of public lands." *Id.* at 9.

This court upheld the decisions of the circuit court and BLNR, reasoning that "section 5(f) does not limit the use of the ceded lands themselves to the five purposes[ ] so long as the proceeds from the disposition of these lands are held in trust." *Id.* at 21. Additionally, based on article XII, section 6 of the Hawai'i Constitution, this court concluded that the State

> has the power to dispose of ceded lands. The actual use to which these lands is put by this disposition does not have to comport with one of the five enumerated purposes in the Admission Act as long as fair compensation for the disposition of these lands is used for trust purposes. *The actual issue in this case, therefore, is whether the issuance of the CDUA permit is a proper disposition of ceded lands.*

*Id.* at 21–22 (emphasis added) (footnote omitted). This court held that the "grant of the permit for the dredging of a marina entrance channel has an undisputably public purpose" and that, therefore, "BLNR's conditional grant of the permit to Haseko did not violate the public trust doctrine and was a proper disposition of public lands." *Id.* at 26–27.

 "Collateral estoppel is an aspect of *res judicata* which precludes the relitigation of a fact or issue which was previously determined in a prior suit on a different claim between the same parties or their privies." *Pele Defense Fund,* 73 Haw. at 599, 837 P.2d at 1261 (citations omitted) (format altered). Thus, the elements of collateral estoppel are:

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Keahole Def. Coal., Inc. v. Bd. of Land & Natural Res.,* 110 Hawai'i 419, 429, 134 P.3d 585, 595 (2006) (citations omitted) (format altered); *see also Citizens for the Prot. of the N. Kohala Coastline v. County of Hawai'i,* 91 Hawai'i 94, 102, 979 P.2d 1120, 1128 (1999). These elements "are tempered only by the prerequisite that a plaintiff have a full and fair opportunity to litigate the relevant issues." *Pele Defense Fund,* 73 Haw. at 600, 837 P.2d at 1261 (citations omitted).

In this case, the trial court ultimately determined that *Ewa Marina* did not collaterally estop the plaintiffs' claims in this case because the "issue of whether the State has the power to *sell* ceded lands ... was not 'essential' to the final judgment in *Ewa Marina,* which merely decided whether the BLNR could issue a permit to *dredge* submerged ceded lands." (Emphases in original.) Curiously, the trial court also found that "the issue of whether the State could sell or dispose of ceded lands for public purposes was actually litigated." However, the trial court, after taking judicial notice of the files in the *Ewa Marina* case, seemingly concluded to the contrary, *i.e.,* that the plaintiffs in the instant case—against whom collateral estoppel is asserted—did not have a " 'full and fair opportunity' in *Ewa Marina* to litigate" the State's authority to alienate ceded lands from the public lands trust.

 Nevertheless, the trial court appears to have correctly determined that two of the elements of collateral estoppel were met in this case, to wit: (1) there was a final judgment on the merits in the *Ewa Marina* case; and (2) the individual plaintiffs are privies of OHA for the purposes of collateral estoppel. However, it is apparent that the other two elements of collateral estoppel are not met here. First, the issue decided in *Ewa Marina*—"whether the issuance of the CDUA permit [was] a proper disposition of ceded lands," *Ewa Marina,* slip op. at 22 (footnote omitted),—is not identical to the issue raised by the plaintiffs in this case, *i.e.,* whether the State, as trustee, should be enjoined from alienating ceded lands from the public lands trust until such times as the claims of the native Hawaiian people to the ceded lands are resolved. Second, the issue whether

such an injunction should be issued was not essential to the final judgment in *Ewa Marina* inasmuch as this court in *Ewa Marina* needed to determine only whether the State violated its fiduciary duties by issuing the CDUA permit. Accordingly, we hold that the trial court correctly determined that *Ewa Marina* did not collaterally estop the plaintiffs' claims in this case. We now turn to the plaintiffs' contentions on appeal as they relate to (1) the Leiali'i parcel and (2) the ceded lands in general. We then examine the political question doctrine and the plaintiffs' request for injunctive relief.

## C. The Leiali'i Parcel

### 1. Sovereign Immunity

The trial court determined that the plaintiffs' claims with regard to the Leiali'i parcel were barred by sovereign immunity because title to the Leiali'i parcel had already been transferred to the HFDC. The trial court reasoned that, in order to return the Leiali'i parcel to the public lands trust, it would be required "to 'turn back the clock and examine actions already taken by the State.'" Thus, the trial court concluded:

> The Leali'i [sic] [parcel is] no longer in the [p]ublic [l]ands [t]rust. Although the [p]laintiffs argue that the [parcel was] merely transferred to another State entity and that sovereign immunity therefore does not apply, the facts show that the State of Hawai'i received payment for the transfer of [this parcel] to the HFDC. [HRS § ] 171–2 specifically exempts from the definition of "public lands" those lands to which the HFDC holds title in its corporate capacity. To return the [parcel] at Leali'i [sic] to the [p]ublic [l]ands [t]rust, the DLNR would have to expend moneys from the State treasury. Moreover, the HFDC has already spent millions of dollars improving those properties.

> Accordingly, this court cannot compel HFDC to return the [parcel] at Leali'i [sic] to the [p]ublic [l]ands [t]rust without directly affecting the state treasury. Pursuant to *Pele Defense Fund v. Paty*, [73 Haw. 578, 837 P.2d 1247 (1992),] [the p]laintiffs' request for injunctive relief . . .

with respect to Leali'i [sic] is, therefore, barred by sovereign immunity.

On appeal, the plaintiffs argue that the trial court erred in concluding that their claim with regard to the Leiali'i parcel was barred by the doctrine of sovereign immunity. Specifically, the plaintiffs take issue with the trial court's reliance on *Pele Defense Fund*. The plaintiffs assert that their claim regarding the Leiali'i parcel was not barred by sovereign immunity because the claim is for prospective injunctive relief. Additionally, the OHA plaintiffs contend that: (1) the requested injunction would not directly affect the State treasury inasmuch as the transfer "from DLNR to HFDC was a paper transaction shifting title from one State agency to another for which DLNR received a mere $1[.00]"; and (2) the "dispute over the Leiali'i [parcel] involves governmental agencies rather than private parties." Consequently, the OHA plaintiffs argue that the case at bar is distinguishable from *Pele Defense Fund*.

The defendants, on the other hand, believe—as did the trial court—that "the State has already transferred the Leiali'i [parcel] to HFDC" and, therefore, to return the parcel to the public lands trust, "DLNR would have to expend moneys from the State treasury." The defendants, therefore, maintain that the trial court correctly determined that *Pele Defense Fund* mandates the conclusion that the plaintiffs' claim is barred by sovereign immunity. Moreover, the defendants argue that the exception to sovereign immunity recognized in *Pele Defense Fund*—"for 'the limited purpose of enjoining state officials' breach of trust by disposal of trust assets in violation of the Hawai'i constitutional and statutory provisions governing the public land trust'"—is inapplicable in this case "because the Admission Act and state constitutional and statutory provisions explicitly authorize the State to sell ceded lands."

The doctrine of sovereign immunity dictates that

> the State cannot be sued without its consent or waiver of its immunity in matters "involving the enforcement of contracts, treasury liability for tort, and the adjudication of interest in property which has become unsullied by tort into the bosom of

government." However, *sovereign immunity may not be invoked as a defense by state officials who comprise an executive department of government when their action is attacked as being unconstitutional. Nor will sovereign immunity bar suits to enjoin state officials from violating state statutes.*

*Pele Defense Fund,* 73 Haw. at 607, 837 P.2d at 1265 (emphasis added) (internal brackets, ellipsis, and citations omitted) (format altered). Additionally, this court has adopted the rule from *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which makes an important distinction between prospective and retrospective relief. *Id.* at 609, 837 P.2d at 1266.

> *If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true even though accompanied by a substantial ancillary effect on the state treasury.* However, relief that is tantamount to an award of damages for a past violation of law, even though styled as something else, is barred by sovereign immunity.

*Id.* at 609–10, 837 P.2d at 1266 (emphasis added) (citations, ellipsis, footnote, and internal quotation marks omitted). The burden is on the State to prove "with specific facts that the effect on the State treasury will be directly, substantially, and quantifiably impacted." *OHA II,* 110 Hawai'i at 357, 133 P.3d at 786 (footnote omitted).

*Pele Defense Fund* involved a claim brought by a non-profit corporation comprised of native Hawaiian beneficiaries of the section 5(f) Admission Act trust, challenging the exchange of ceded lands in Puna on the island of Hawai'i for privately owned lands. 73 Haw. at 584–85, 837 P.2d at 1253. The plaintiff prayed for, *inter alia,* injunctive relief to restore the Puna parcel to the public lands trust, arguing that the transfer constituted a breach of the trust created under section 5(f) and article XII, section 4 of the Hawai'i Constitution. *Id.* This court held that, although the plaintiff's claim was couched as a claim for prospective injunctive relief, its "request that the trust status of the exchanged lands be restored by means of a

constructive trust [was] essentially equivalent to a nullification of the exchange and the return of the exchanged lands to the trust res." *Id.* at 611, 837 P.2d at 1267 (internal quotation marks omitted). This court, therefore, concluded that the "effect on the state treasury would be direct and unavoidable, rather than ancillary, because imposing a constructive trust on lands [then privately owned] would require ... the State to compensate [the purchaser] for its property." *Id.* at 611, 837 P.2d at 1267 (citations omitted). Consequently, we held that the plaintiff's "requested relief [was], in effect, a request for compensation for the past actions of the [State]" and was, accordingly, barred by sovereign immunity. *Id.*

Subsequent cases decided by this court have reaffirmed the continued viability of the analysis articulated in *Pele Defense Fund. See, e.g., OHA II,* 110 Hawai'i at 356–57, 133 P.3d at 785–86 (holding that, under *Pele Defense Fund,* plaintiffs' claims alleging a breach of the State's fiduciary duties were barred by sovereign immunity because the plaintiffs requested relief—a share of revenues that the State had collected from the ceded lands trust—was essentially a request for past monetary damages, and, therefore, the relief requested was "retrospective"); *Bush v. Watson,* 81 Hawai'i 474, 481–82, 918 P.2d 1130, 1137–38 (1996) (holding that claims by native Hawaiian homestead lessees, challenging the validity of third-party agreements (TPAs) between other lessees and non-Hawaiian farmers as violating the Hawaiian Homes Commission Act, were not barred by sovereign immunity because they sought declaratory and injunctive relief that would void existing TPAs and enjoin the Hawaiian Homes Commission from approving future TPAs); *Aged Hawaiians v. Hawaiian Homes Comm'n,* 78 Hawai'i 192, 208 n. 26, 891 P.2d 279, 295 n. 26 (1995) (noting that, with respect to claims against state officials, claimants cannot recover money damages or the equivalent for past violations of law; nevertheless, relief that is prospective in nature may be allowed regardless of the state's sovereign immunity).

Most recently, this court affirmed the *Pele Defense Fund* analysis in *Kahoʻohanohano v.*

*State*, 114 Hawai'i 302, 162 P.3d 696 (2007). *Kaho'ohanohano* involved a class action lawsuit brought by members of the Employees' Retirement System of the State of Hawai'i (ERS), the State of Hawai'i Organization of Police Officers, and the trustees of ERS [hereinafter, the plaintiffs] against the State alleging a breach of trust. *Id.* at 310, 162 P.3d at 704. The plaintiffs sought declaratory and injunctive relief based on a challenge to a statute that authorized the diversion of $346.9 million from the ERS fund, which the plaintiffs alleged violated the State's constitutional and contractual obligations to ERS members. *Id.* at 315, 162 P.3d at 709. This court determined that, inasmuch as the State had not expressly waived sovereign immunity and the plaintiffs did not claim money damages, "the relevant inquiry [was] whether the relief sought for a past violation of law [was] 'tantamount to an award of damages' or would merely have an 'ancillary' effect on the state treasury." *Id.* at 337, 162 P.3d at 731 (citation and other internal quotation marks omitted).[18] Ultimately, this court concluded that, by granting the plaintiffs' requested relief, the effect on the state treasury, if any, would be only "ancillary" inasmuch as the state would be prohibited from any future "skimming" from the ERS fund. *Id.* Accordingly, this court held that the plaintiffs' claims were not barred by sovereign immunity. *Id.* at 337–38, 162 P.3d at 731–32.

■ In this case, the plaintiffs seek to enjoin the actions of state executive officials from transferring the Leiali'i parcel because they believe such transfer would further diminish the corpus of the public lands trust—in violation of the State's constitutional and statutory fiduciary duties—before their unrelinquished claims to the ceded lands could be resolved. As in *Kaho'ohanohano*, the State, here, has not expressly waived sovereign immunity, and the plaintiffs do not claim money damages. Although the plaintiffs characterize their claim with respect to the Leaili'i parcel as being one for prospective injunctive

relief, *i.e.*, enjoining the transfer of the Leiali'i parcel, the parcel was, in fact, transferred from DLNR to HFDC on the same day the plaintiffs filed suit. Accordingly, in this case, as in *Kaho'ohanohano*, "the relevant inquiry is whether the relief sought for a past violation of law[, *i.e.*, the transfer of property,] is 'tantamount to an award of damages' or would merely have an 'ancillary' effect on the state treasury." *Kaho'ohanohano*, 114 Hawai'i at 337, 162 P.3d at 731 (some internal quotation marks and citation omitted).

Unlike *Pele Defense Fund*, in which ceded lands were exchanged for privately owned lands, the Leiali'i parcel was transferred from one state agency to another, *i.e.*, from DLNR to HFDC. Moreover, the consideration of $1.00 was also paid from one state agency to another. In other words, the return of the property and purchase price between both state agencies effectively changes nothing. Both the parcel and the $1.00 would remain within the control of the State. To the contrary, because the lands at issue in *Pele Defense Fund* had been transferred to a private third-party, this court concluded that *the State would have to compensate the private third-party* for the return of the property in the public lands trust. 73 Haw. at 611, 837 P.2d at 1267. In that regard, *Pele Defense Fund* is distinguishable from the instant case because the Leiali'i parcel would remain within the control of the State. Returning the parcel to the public lands trust would require only that the HFDC transfer title back to DLNR and that DLNR pay only $1.00 for such transfer. As such, the effect on the State treasury, if any, would be only ancillary.

However, in concluding that sovereign immunity barred the plaintiffs' claims with regard to the Leiali'i parcel, the trial court additionally relied upon the fact that, prior to the transfer of the Leiali'i parcel, HFDC had spent $31 million developing infrastructure on the property. In so doing, the trial court did not provide any explanation as to how the

18. We note that this court's conclusion in *Kaho'ohanohano* is consistent with *Bush*, wherein we "decline[d] to adopt the federal courts' narrow view that a claim for relief based on past illegal action is necessarily 'retrospective[,]'" holding instead that "the crucial inquiry under our sovereign immunity principles is whether the relief sought for a past violation of law is 'tantamount to an award of damages' or would merely have an 'ancillary' effect on the state treasury." *Bush*, 81 Hawai'i at 482 n. 9, 918 P.2d at 1138 n. 9 (citations omitted).

expenditure of $31 million *prior* to the plaintiffs' filing of the present lawsuit resulted in a "direct" as opposed to "ancillary" effect on the state treasury. We further observe that the parties do not any present argument on this issue.

Although we recognize that $31 million dollars is a significant sum of money, that fact alone is insufficient to support a conclusion that such past expenditure constitutes a "direct" future effect on the state treasury. Indeed, as previously stated, sovereign immunity does not bar a claim for prospective injunctive relief *"even though accompanied by a substantial ancillary effect on the state treasury."* *Pele Defense Fund*, 73 Haw. at 609, 837 P.2d at 1266 (emphasis added) (internal quotation marks, citation, and footnote omitted). In the case at bar, the plaintiffs are not asking that the $31 million be returned to them or even to the state treasury. Moreover, the benefit of the $31 million expenditure by HFDC on infrastructure remains with the State. Thus the plaintiffs' requested relief—*i.e.*, an injunction—is *not* "tantamount to an award of damages for a past violation of law." *Id.* at 609–10, 837 P.2d at 1266 (internal quotation marks, citation, and ellipsis omitted). As such, the effect of the expenditure of $31 million on the state treasury is "ancillary"—albeit a substantial one. We, therefore, hold that the plaintiffs' claim for injunctive relief with regard to the Leialiʻi parcel is not barred by sovereign immunity. Accordingly, we also hold that the trial court erred in determining otherwise.

### 2. Waiver and Estoppel

The plaintiffs argue that the trial court erred in determining that the defenses of waiver and estoppel barred the plaintiffs' request for injunctive relief with respect to the Leialiʻi parcel. Because waiver and estoppel are distinct doctrines, we analyze them separately below.

#### a. *waiver*

The trial court concluded that the [p]laintiffs, by their actions and inactions during the seven years between 1987 and 1994 ... waived any right they may have

had to contest the sale of [the Leialiʻi parcel] to HFDC as illegal.

. . . .

The [i]ndividual [p]laintiffs argue that they and their counsel relied on Congress's 1993 Apology Resolution and the Legislature's Act 359 of 1993 as central bases to seek an injunction in the fall of 1994 on the sale of ceded lands, pending resolution of the Hawaiians' claim to ownership of the ceded lands. Mr. Meheula's discussions with the OHA Board did cause OHA to insist in the fall of 1994 that a disclaimer be placed in the HFDC agreements.

As a practical matter, however, neither OHA nor the [i]ndividual [p]laintiffs objected to the sale of the [Leialiʻi parcel] until the fall of 1994. In any event, even if the [p]laintiffs did not consider challenging the State's power to sell ceded lands until after the Apology Resolution was adopted in 1993, OHA's continuing to negotiate for market value after the Apology Resolution was passed is also "conduct from which an intention to waive may reasonably be inferred." [The p]laintiffs' failure to object to the development plan, which included market homes, before the LUC and Legislature in testimony relating to Act 318 is "wholly inconsistent with any dissatisfaction" with the development plan, also suggesting waiver of any right to challenge them. [*Goo v. Hee Fat*, 34 Haw. 123, 129 (1997) [(1937)], *overruled on other grounds by Goo v. Goo*, 36 Haw. 530 (1943).]

Moreover, HFDC and the State were prejudiced by their reliance on [p]laintiffs' acquiescence in the development plan to sell [the Leialiʻi parcel]. As testified to by the project managers for both Lealiʻi [sic] and Laʻiʻopua, there were no objections from OHA as to the State's power to sell public trust lands for those projects until November 1994. By that time, however, $31 million had already been invested in Lealiʻi [sic].

(Footnotes omitted.)

The plaintiffs argue that they did not waive their claim with regard to the Leialiʻi parcel. The OHA plaintiffs' maintain that,

[a]fter the passage of the Apology Resolution, and as the full import of the congressional findings that [c]rown, [g]overnment and [p]ublic lands were ceded to the United States "without the consent of or compensation to the [n]ative Hawaiian people of Hawai'i or their sovereign government" and that "the indigenous Hawaiian people never directly relinquished their claims to their inherent sovereignty as a people or over their national lands to the United States[ ]" became evident, the OHA Trustees took appropriate action to assure that the claim to the "national lands" of the [n]ative Hawaiian people was properly asserted.

As indicated by the trial court, the individual plaintiffs posit that, "[a]lthough OHA did not earlier object to the transfer of ceded lands for the ultimate sale to homeowners in the Leiali'i project, the 1993 legislation [ (*i.e.*, the Apology Resolution, as well as, Acts 359 and 329, discussed *supra* ) ] and Mr. Meheula's discussions with the OHA Board in [September 1994] were new events that justified their objection in [September 1994]."

Relying on the ruling and rationale of the trial court, the defendants maintain that the plaintiffs waived their claims regarding the Leiali'i parcel because the "[p]laintiffs' failure to object to the development plan at the LUC and before the Legislature in testimony relating to Act 318 [ (setting forth a formula to compensate OHA for the 'villages of Leiali'i, Maui and villages of La'i'opua, Hawai'i') ] is 'wholly inconsistent with any dissatisfaction' with the development plan ... and[, therefore,] clearly waived any right to challenge the plan." The defendants further maintain that, "[e]ven if plaintiffs did not think to challenge the State's power to sell [c]eded lands until after the Apology Resolution, OHA's continuing to negotiate for 'market value' after the Apology Resolution was passed is clearly 'conduct from which an intention to waive may reasonably be inferred.' "

■ This court has defined waiver as "an intentional relinquishment of a *known right*, a voluntary relinquishment of rights, and the relinquishment or refusal to use a right." *Coon v. City & County of Honolulu,*

98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002) (emphasis added) (citation omitted).

To constitute a waiver, there must have existed a right claimed to have been waived and the waiving party *must have had knowledge, actual or constructive, of the existence of such a right at the time of the purported waiver.* While the question whether a valid waiver exists is generally a question of fact, "when the facts are undisputed it may become a question of law." *Hawaiian Homes Comm'n v. Bush,* 43 Haw. 281, 286 (1959) (citations omitted); *see also Stewart v. Spalding,* 23 Haw. 502, 517 (1916) ("The question of waiver is usually a mixed one of law and fact but where the facts are undisputed and are susceptible of but one reasonable inference it becomes one of law for the court." (Citations omitted.)).

*Id.* at 261–62, 47 P.3d at 376–77 (some citations and original ellipsis omitted) (emphasis added). Furthermore,

[w]aiver must be intentional. Such intention may be indicated by language or conduct, may be either express or implied but does not necessarily imply that one has been misled to his prejudice or into an altered position. Waiver depends upon the intention of the party who is charged with the waiver.... It may be proven by an express declaration of the party charged with the waiver. It may also be proved by the existence of acts or language so inconsistent with the purpose of the person charged to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary.

*Hewahewa v. Lalakea,* 35 Haw. 213, 218–19 (1939) (emphasis added) (internal quotation marks and citations omitted).

■ In this case, the record indicates that the first time that OHA had knowledge that DLNR intended to alienate the Leiali'i parcel from the public lands trust for the purposes of residential development was in December 1989 when HFDC filed a petition with the LUC to reclassify the Leiali'i parcel from agriculture to urban use. It is undisputed that OHA did not object to the transfer of the Leiali'i parcel and participated in negotiations with HFDC regarding the par-

cel's fair market value, pursuant to Act 318. As previously stated, it was not until the adoption of the Apology Resolution that OHA requested the disclaimer that its acceptance of funds would not affect any further claim the native Hawaiian people may have to the Leiali'i parcel. When HFDC declined to honor their request, the plaintiffs filed suit.

In support of their position that they did not waive their claim with regard to the Leiali'i parcel, the plaintiffs essentially maintain that the Apology Resolution gave rise to their breach of trust claim. Pointing to language in the Apology Resolution that "the indigenous Hawaiian people never directly relinquished their claims to their inherent sovereignty as a people or over their national lands to the United States," Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510, the plaintiffs submit that title to the ceded lands is now clouded.

■ Having held that the Apology Resolution and related state legislation give rise to a fiduciary duty by the State, as trustee, to preserve the corpus of the public lands trust, specifically, the ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved, it necessarily follows that it was not until at least November 23, 1993, when the Apology Resolution was signed into law by President Clinton, that the plaintiffs "had knowledge, actual or constructive, of the existence of ... a right [claimed to have been waived] at the time of the purported waiver." *Coon*, 98 Hawai'i at 261, 47 P.3d at 376 (citation omitted). Consequently, we cannot say that the plaintiffs' purported waiver was "intentional," expressly or impliedly. *Hewahewa*, 35 Haw. at 218. Accordingly, we hold that the trial court's conclusion that OHA's actions between 1987 and 1994 constituted a waiver of the plaintiffs' claims was clearly erroneous and that, therefore, the trial court erred in determining that the plaintiffs waived their

claim for injunctive relief with regard to the Leiali'i parcel.[19]

### b. *estoppel*

The trial court ruled that, "[f]or the same reasons that [the p]laintiffs waived any challenge to the legality of the sales of Leali'i [sic] lands, [the p]laintiffs are estopped from making that challenge." Specifically, the trial court found that,

[a]pplying equitable estoppel and quasi estoppel principles to the case at hand, during the years of negotiations and planning for Leali'i [sic] before [the p]laintiffs filed this lawsuit, [the p]laintiffs did not suggest that they would file a lawsuit challenging the right to sell the [Leiali'i parcel] to HFDC and in turn to third parties for their homes. During these same five years, the [p]laintiffs had notice of the planned development at Leali'i [sic], but chose not to challenge it. The State spent substantial amounts of time and money developing [the parcel] before November 1994 when [the p]laintiffs first filed suit.

By their action (or inaction with respect to the [i]ndividual [p]laintiffs) and conduct ... [the p]laintiffs caused the HFDC to believe that no one would challenge its acquisition of the [Leiali'i parcel] as long as OHA and DLNR received fair monetary compensation for the lands. [The p]laintiffs' acquiescence in the development of Leali'i [sic] and HFDC's expenditure of funds for infrastructure, and OHA's active participation in negotiations for an appraised value for the ceded lands induced the State to continue moving forward with the housing development. The State obtained necessary land use changes, entered into agreements with developers, made agreements with county officials and spent over $31 million for infrastructure at Leali'i [sic] alone. The State significantly altered its position because of the state-

---

19. The trial court also based its holding on the fact that the defendants expended over $31 million dollars on improvements to the Leiali'i parcel prior to the transfer from DLNR to HFDC. However, the question on waiver is strictly whether the party charged with waiver intended to waive a known claim, *Hewahewa*, 35 Haw. at 218–19, *not* whether the party seeking to prove waiver was prejudiced, as was determined by the trial court. As such, the trial court's finding that, because OHA did not object to the transfer of the Leiali'i parcel until 1994, HFDC and the State were prejudiced by their reliance on the plaintiffs acquiescence in the project does not apply to an analysis of waiver.

ments and conduct of OHA, as well as the inaction of the [i]ndividual [p]laintiffs. [The p]laintiffs are, therefore, also estopped from challenging the State's sale of public trust lands at Leali'i [sic].

It is true, as argued by the OHA [p]laintiffs, that the doctrine of equitable estoppel cannot be invoked against a governmental agency such as OHA in the absence of overt detrimental reliance and "manifest injustice." The law recognizes that governmental bodies must be able to change their minds in some circumstances. Thus, a mere change of mind by the government does not invoke estoppel unless the other party had detrimentally relied upon the agency's earlier position to such an extent that it would constitute a "manifest injustice" to fail to invoke and apply the doctrine. In this case, however, based on the facts above, the requisite showings of extensive detrimental reliance by and manifest injustice to the [d]efendants have been satisfied to invoke equitable estoppel against the OHA plaintiffs. Thus, the doctrine of estoppel prohibits both sets of [p]laintiffs from seeking injunctive relief with respect to the sale of [the Leiali'i parcel].

(Internal footnotes omitted.) (Format altered.)

The OHA plaintiffs argue that the trial court erred in concluding that the doctrine of estoppel barred the plaintiffs claims because it is "manifestly unjust to [n]ative Hawaiians to allow alienation of [c]eded [l]ands—their national lands—prior to a final resolution of the [n]ative Hawaiian land claim." Additionally, the OHA plaintiffs argue that the application of the doctrine of equitable estoppel against the government is not favored, and, furthermore, "there can be no suggestion here that OHA wilfully misled the HFDC in its earlier position on the Leiali'i [parcel] or acted in bad faith." The individual plaintiffs appear to contend that estoppel is not applicable in this case because it is an equitable defense, which cannot be raised against the plaintiffs because "the 1993 Legislation obligated the State to seek instructions from the [c]ourt before selling ceded lands without prompting by [the p]laintiffs."

The defendants insist that the trial court correctly determined that the plaintiffs were estopped from challenging the transfer of the Leiali'i parcel because the "unchallenged findings of facts show that HFDC spent more than $31 million at Leiali'i over a seven-year period in reliance on OHA's failure to object to the project." Accordingly, the defendants assert that "[t]hese facts squarely raise the defense of equitable estoppel[.]"

■■■ "The theory of equitable estoppel requires proof that one person wilfully caused another person to erroneously believe a certain state of things, and that person reasonably relied on this erroneous belief to his or her detriment." *Potter v. Hawai'i Newspaper Agency*, 89 Hawai'i 411, 419, 974 P.2d 51, 59 (1999) (citation omitted). "A species of equitable estoppel, the principle of quasi estoppel, precludes a party from asserting to another's disadvantage, a right inconsistent with a position previously taken." *Id.* at 420, 974 P.2d at 60 (internal brackets and citation omitted).

■■■ As the OHA plaintiffs correctly point out, "[t]he application of the doctrine of equitable estoppel against the government is not favored." *Turner v. Chandler*, 87 Hawai'i 330, 333, 955 P.2d 1062, 1065 (App.1998) (citations omitted). However, this court has also stated that the doctrine "is fully applicable against the government if it is necessary to invoke it to prevent manifest injustice." *State ex rel. Kobayashi v. Zimring*, 58 Haw. 106, 126, 566 P.2d 725, 737 (1977) (internal quotation marks and citation omitted).

■■■ As previously discussed, it was not until the Apology Resolution was signed into law on November 23, 1993 that the plaintiffs' claim regarding the State's explicit fiduciary duty to preserve the corpus of the public lands trust arose. As such, it was not until that time that the plaintiffs' lawsuit could have been grounded upon such a basis. Consequently, the plaintiffs cannot be deemed to have "wilfully caused [the defendants] to erroneously believe *a certain state of things,*" *Potter,* 89 Hawai'i at 419, 974 P.2d at 59, upon which the defendants relied to their detriment.

Accordingly, we conclude that the trial court incorrectly determined that the plaintiffs were estopped from challenging the transfer of the Leialiʻi parcel based on their pre–1993 actions and hold that the plaintiffs' claims are not barred by the principles of equitable and quasi estoppel. We now turn to the plaintiffs' arguments as they relate to the ceded lands in general.

## D. *The Ceded Lands in General*

### 1. **Sovereign Immunity**

With regard to ceded lands in general, the trial court concluded that:

> Case law has held that sovereign immunity does not bar a suit for injunctive relief to prohibit state officials from acting in an illegal manner. [ (Citing in a footnote to *Pele Defense Fund, supra.*) ] The State of Hawaiʻi has not consented, however, to be sued in a lawsuit contesting the validity of its title to the ceded lands. "It is the law in this jurisdiction that a proceeding against property in which the State of Hawaiʻi has an interest is a suit against the State and cannot be maintained without the consent of the State," so that the State "and its interest in land are immune from suit." [ (Citing in a footnote to *A.C. Chock, Ltd. v. Kaneshiro*, 51 Haw. 87, 88, 451 P.2d 809, 811 (1969).) ] "If it is made to appear at any stage of the case that the State claims title, the court's jurisdiction over the merits of such claim thereby is ousted under the doctrine of sovereign immunity." [ (Citing in a footnote to *Marks v. Ah Nee*, 48 Haw. 92, 94, 395 P.2d 620, 622 (1964).) ]
>
> A claim for injunctive and declaratory relief would have the effect of depriving the State of control over public lands under [HRS] chapters 171 and 201E is the "functional equivalent of a quiet title action," and is barred by sovereign immunity. [ (Citing in a footnote to *Idaho v. Couer* [*Coeur*] *d'Alene Tribe*, 521 U.S. 261 [117 S.Ct. 2028, 138 L.Ed.2d 438] (1997).) ] Looking beyond the pleadings to "examine the effect" of the suit and "its impact on these special sovereignty interests [of the State]," sovereign immunity bars [p]laintiffs' claims to the extent they seek relief based on an allege [sic] cloud on the State's title to ceded lands. Where the "requested injunctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters," and "would diminish, even extinguish, the State's control over a vast reach of land and waters long deemed by the State to be an integral part of its territory," sovereign immunity applies. [ (Citing in a footnote to *Couer* [*Coeur*] *d'Alene* ) ]

(Internal footnotes omitted.)

The plaintiffs take issue with the trial court's reliance on *Coeur d'Alene.* Specifically, the plaintiffs challenge the trial court's determination that their claims with regard to the sale of ceded lands in general "were the functional equivalent of a quiet title action"[20] and, therefore, barred by sovereign immunity inasmuch as " '[i]t is the law in this jurisdiction that a proceeding against property in which the State of Hawaiʻi has an interest in is a suit against the State and cannot be maintained without the consent of the State[.]' " On appeal, the OHA plaintiffs contend that they are not seeking ownership of property from this court, but "*only* an order prohibiting the transfer of [c]eded [l]ands pending the resolution of [n]ative Hawaiian claims." (Emphasis in original.) As such, the OHA plaintiffs argue that the trial court's reliance on *Coeur d'Alene*, discussed *infra*, was error. The OHA plaintiffs submit that the trial court should have, instead, been guided by *Mille Lacs Band of Chippewa Indians v. Minnesota*, 124 F.3d 904 (8th Cir.1997), *aff'd*, 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999), discussed *infra.* The individual plaintiffs similarly maintain that they "do not seek an ownership determination or even a declaration that they are entitled to the beneficial use and/or occupancy of the ceded lands."

The defendants, however, contend that the trial court correctly relied on *Coeur d'Alene* because, as in this case, " 'the requested in-

---

20. An action to quiet title is defined as an action brought "by any person against another person who claims, or who may claim adversely to the plaintiff, an estate or interest in real property, for the purpose of determining the adverse claim." HRS § 669–1(a) (1993).

junctive relief would bar the State's principal officers from exercising their governmental powers and authority over the disputed lands and waters,' and 'would diminish, even extinguish the State's control over a vast reach of lands ... long deemed by the State to be an integral part of its territory.'" (Citing *Coeur d'Alene*, 521 U.S. at 282, 117 S.Ct. 2028).

In *Coeur d'Alene*, the sole issue before the Court was whether the federally recognized Coeur d'Alene Tribe's (the Tribe) suit against the State of Idaho, seeking "the beneficial interest, subject to the trusteeship of the United States, in the beds and banks of all navigable watercourses and waters (the 'submerged lands') within the original boundaries of the Coeur d'Alene Reservation," was barred by sovereign immunity. 521 U.S. at 264–65, 117 S.Ct. 2028. The Tribe styled its suit as a claim for declaratory and injunctive relief, "alleging an ongoing violation of its property rights in contravention of federal law and [seeking] prospective injunctive relief." *Id.* at 266, 281, 117 S.Ct. 2028. The Court recognized that "[a]n allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* [exception].[21] However, this case is unusual in that the Tribe's suit is the functional equivalent of a quiet title action which implicates special sovereignty interests." *Id.* at 281, 117 S.Ct. 2028. The Court, in its principal decision, determined that the Tribe's suit was the functional equivalent of a quiet title action "in that substantially all benefits of ownership and control [in the submerged lands] would shift from [Idaho] to the Tribe." *Id.* at 282, 117 S.Ct. 2028. Moreover, the Court reasoned that the submerged lands "have historically been considered 'sovereign lands[,'] and] State ownership of them has been considered an essential attribute of sovereignty." *Id.* at 283, 117 S.Ct. 2028 (internal quotation marks and citation omitted). The Court concluded:

It is apparent, then, that[,] if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury. Under these particular and special circumstances, we find the *Young* exception inapplicable. The dignity and status of its statehood allow Idaho to rely on its Eleventh Amendment immunity and to insist upon responding to these claims in its own courts, which are open to hear and determine the case.

*Id.* at 287–88, 117 S.Ct. 2028.

In a concurring opinion, Justice O'Connor seemingly attempted to clarify the Court's decision by distinguishing *Coeur d'Alene* from *Ex parte Young*. She noted that

the Tribe does not merely seek to possess land that would otherwise remain subject to state regulation, or to bring the State's regulatory scheme into compliance with federal law. Rather, the Tribe seeks to eliminate altogether the State's regulatory power over the submerged lands at issue— to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all.

*Id.* at 289, 117 S.Ct. 2028 (O'Connor, J., concurring).

As previously stated, the OHA plaintiffs suggest that the trial court erred in applying the *Coeur d'Alene* analysis and should look instead to the Eighth Circuit's opinion in *Mille Lacs*. In *Mille Lacs*, the Mille Lacs Band of Chippewa Indians (the Band), amongst others, brought an action for injunctive and declaratory relief, seeking to enforce its alleged treaty rights to hunt, fish, and gather on state and private lands free of state regulation. 124 F.3d at 914. The Eighth Circuit held that the Band's claims were not barred by sovereign immunity, reasoning, *inter alia*, that the Bands' claims "[sought] prospective injunctive relief against

---

21. As previously indicated, this court, in *Pele Defense Fund*, adopted the rule expressed in *Ex Parte Young*, which differentiated between prospective and retrospective relief. 73 Haw. at 609, 837 P.2d at 1266. Accordingly, it is the law in this state that, "[i]f the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity. This is true even though accompanied by a substantial ancillary effect on the state treasury." *Id.* (internal quotation marks and citations omitted); *see* discussion *supra*.

state officials in their official capacities for continuing violations of the Bands' federal treaty rights. As such, they fall squarely within the *Ex parte Young* exception to the [sovereign immunity doctrine]." *Id.* The court further noted that its holding was supported by the *Coeur d'Alene* Court's concurring opinion, which observed that "[a] *Young* suit is available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective." *Id.* (quoting *Coeur d'Alene*, 521 U.S. at 294, 117 S.Ct. 2028 (O'Connor, J., concurring)) (internal quotation marks omitted).

In the present case, the plaintiffs, unlike the *Coeur d'Alene* plaintiffs, do not seek a determination from this court that would shift "the benefits of ownership and control [of the ceded lands] from the State to [themselves]." *Coeur d'Alene*, 521 U.S. at 282, 117 S.Ct. 2028. Rather, they seek only to enjoin the defendants from alienating ceded lands.

■■■ Based on *Mille Lacs* and Justice O'Connor's concurrence in *Coeur d'Alene*, a claim seeking injunctive relief with regard to property rights may be maintained, if it falls within the *Young* exception, *i.e.*, allowing only prospective injunctive relief. Here, as the plaintiffs have repeatedly made clear, they are not asking this court to return the ceded lands to the possession of the plaintiffs; they seek only an injunction barring

the *future* alienation—by way of sale or transfer—of ceded lands until their unrelinquished claims to those lands are resolved via the reconciliation process contemplated by the Apology Resolution and related state legislation. As such, the plaintiffs' requested relief is clearly prospective in nature and, therefore, not barred by sovereign immunity under the *Young* exception.

Based on the foregoing discussion, we hold that the plaintiffs' claims with regard to the sale or transfer of the ceded lands in general are not barred by sovereign immunity. Accordingly, we also hold that the trial court incorrectly determined that sovereign immunity barred the plaintiffs' claims.[22]

## 2. Ripeness

The trial court, in ruling that the plaintiffs' claims with regard to the ceded lands in general were also barred by the ripeness doctrine, stated:

With respect to "ripeness," *Pele Defense Fund* makes clear that beneficiaries of the ceded lands trust have standing to bring suit to enjoin disposition of ceded lands that would constitute breaches of trust. No evidence was presented, however, of any proposed sales of ceded lands other than at Leali'i [sic]. In fact the evidence suggests that the State has been following a self[-]imposed moratorium on the sales of additional ceded lands.[23] Proposed sales

---

**22.** In addition to the arguments stated above, the individual plaintiffs, in their opening brief, argue that the State waived sovereign immunity under the "Native Hawaiian Trusts Judicial Relief Act" contained in HRS chapter 673 (Supp.2006). However, in a previous motion filed with the circuit court, the individual plaintiffs argued that "[c]hapter 673, Native Hawaiian Trusts Judicial Relief Act, does not permit [n]ative Hawaiians to sue the State for return of ceded lands." Inasmuch as the individual plaintiffs admit in a prior pleading that HRS chapter 673 does not apply in this situation and there is no other mention of this argument in the proceedings before the trial court, the plaintiffs have waived this argument.

**23.** In explaining the "self-imposed moratorium," the trial court stated:

The Administrator for the Lands Division of the DLNR [ (*i.e.*, Michael Wilson) ] wrote [a memorandum] to [the] then Chair of DLNR, stating that "a moratorium" on the sale of

ceded lands was in effect[ ] and that "the current moratorium is based on the concern that the sale of ceded lands diminishes the corpus of the public lands and thereby diminished the potential return to OHA [ [hereinafter, the Wilson Memorandum] ]."

At trial, Gilbert Coloma–Agaran, chair of the BLNR, testified regarding the Wilson Memorandum as follows:

Q [By OHA Plaintiffs' Counsel]: ... So, were you working for Michael Wilson at the time, deputy director?

A: [By Coloma–Agaran]: In April '95, yes.

Q: Are you familiar with that memorandum?

A: I've seen it.

Q: And are you familiar with a moratorium that [then-]Director Wilson refers to?

A: Yes.

Q: And could you—could you tell us what that was about.

A: I guess shortly after we got there Michael decided that given the controversy over the sale of ceded lands that we would try not

could constitute breaches of trust, but … not all sales of ceded lands would violate the ceded lands trust.

(Footnotes omitted.)

The OHA plaintiffs argue that the trial court erred in determining that their claims were not ripe because "the court need not resolve the breach of trust issue in order to grant injunctive relief." Additionally, the OHA plaintiffs assert that

> the [trial] court's ruling places [the plaintiffs] on the horns of a dilemma. [The plaintiffs] it seems, filed both too early and too late. [They] waited too long on the Leiali'i parcel and not long enough on the moratorium. [The plaintiffs] must wait until the State takes preliminary steps to enjoin the sale of [c]eded [l]ands, but because the State took preliminary steps in the Leiali'i transfer, injunctive relief is barred because it would 'turn back the clock and examine actions already taken by the State.'

The defendants assert that the trial court correctly determined that the plaintiffs' claims were barred by the doctrine of ripeness because the plaintiffs "preemptive[ly] challenge" the "sale of any and all [c]eded [l]ands." The defendants reason that "any particular sale of [c]eded [l]ands could present a conflict of interest or a breach of fiduciary duty (for example, if the State proposed to sell for less than fair market value to a state official for his or her private benefit)[,]" but that "this [c]ourt should decline to speculate as to such future events." Additionally, the defendants argue that "the trial court rightly declined to enter relief based on the assumption that the coordinate and coequal executive and legislative branches will engage in bad faith and wrongful conduct in the future. This [c]ourt should also decline to do so."

 We have stated that "ripeness is peculiarly a question of timing, and a ruling that an issue is not ripe ordinarily indicates the court has concluded a later decision may be more apt or that the matter is not yet appropriate for adjudication." *County of Kaua'i ex rel. Nakazawa v. Baptiste,* 115 Hawai'i 15, 36, 165 P.3d 916, 937 (2007) (internal quotation marks and citation omitted). Moreover, "prudential rules of judicial self-governance founded in concern about the proper—and properly limited—role of courts in a democratic society, [and] considerations flowing from our coequal and coexistent system of government, dictate that we accord those charged with drafting and administering our laws a reasonable opportunity to craft and enforce them in a manner that produces a lawful result." *Save Sunset Beach Coal. v. City & County of Honolulu,* 102 Hawai'i 465, 483, 78 P.3d 1, 19 (2003) (internal quotation marks, original brackets, and citation omitted). The federal courts have applied the following test, which we believe is instructive, in determining whether a particular case is ripe:

> Because ripeness is peculiarly a question of timing, the court must look at the facts as they exist today in evaluating whether the controversy before us is sufficiently concrete to warrant our intervention. The ripeness inquiry has two prongs: the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. The fitness element requires that the issue be primarily legal, need no further factual development, and involve a final agency action. To meet the hardship requirement, a party must show that withholding judicial review would result in direct and immediate hardship and would entail more than possible financial loss.

*Rice v. Cayetano,* 941 F.Supp. 1529, 1538 (D.Haw.1996) (citations and internal quotation marks omitted), *rev'd on other grounds,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).

 With respect to the first prong of the federal test, the plaintiffs must show that the issue regarding their entitlement to in-

***

to sell but that if we wanted to move forward some transaction, we would. So, if there were basically sales were [sic] already approved by the board before we got there we couldn't. If properties was [sic] necessary because of some ongoing project, you now, we take it case by case. But that *generally that we wouldn't encourage the sale of the public lands.*

(Emphasis added.)

junctive relief is fit for judicial decision because the issue is "primarily legal, need[s] no further factual development and involve[s] a final agency action." *Id.* (internal quotation marks and citation omitted). Here, as the plaintiffs argue, the issue is fit for judicial resolution inasmuch as they are not seeking a determination whether the native Hawaiian people are entitled to ownership of the ceded lands; what they are seeking is a determination whether an injunction is appropriate to allow for a resolution of their claims to the ceded lands without further diminishment of the trust res. There is no doubt that the issuance of an injunction involves a legal question. *See, e.g.,* HRCP Rule 65 (2007) (governing the issuance of injunctive relief); *Wahba, LLC v. USRP (Don), LLC,* 106 Hawai'i 466, 106 P.3d 1109 (2005) (describing injunctions and temporary restraining orders). Moreover, the record demonstrates that there is no need for further factual development inasmuch as the facts necessary to decide ripeness are currently before this court. With regard to the Leiali'i parcel, a final agency action (*i.e.,* the transfer of the parcel from DLNR to HFDC) has been taken, and, although "final agency action" with regard to the ceded lands in general has yet to be taken, the very nature of the plaintiffs' requested relief—that an injunction issue to protect the corpus of the public land trust until the reconciliation efforts contemplated by the Apology Resolution and related state legislation has been completed—dictates that a judicial decision regarding the issuance of such an injunction is appropriate. We, therefore, believe that the fitness element has been met.

█ With respect to the second prong of the federal test, *i.e.,* the hardship requirement, the plaintiffs must show "that withholding judicial review would result in direct and immediate hardship and would entail more than possible financial loss." *Rice,* 941 F.Supp. at 1538 (internal quotation marks and citation omitted). Here, inasmuch as the Leiali'i parcel was transferred to the HFDC for purposes of developing a residential housing project, and, although the defendants have voluntarily discontinued development, there exists a real threat that, should the HFDC proceed with the housing develop-

ment project, the parcel could be transferred by the HFDC to third parties. Moreover, as indicated by the trial court, "the State has been following a self[-]imposed moratorium on the sales of additional ceded lands." Thus, by the same token, should the State decide to lift its own moratorium, there is a potential for the sale or transfer of additional ceded lands. Once the ceded lands are alienated from the public lands trust, they will be lost forever and will not be potentially available to satisfy the unrelinquished claims of native Hawaiians to the lands, as recognized and contemplated by the Apology Resolution and the related state legislation, discussed *supra.* Were this court to withhold consideration of the plaintiffs' request for injunctive relief, the State would be free to alienate the ceded lands from the public lands trust. And, in so doing, the resulting hardship to the plaintiffs would be obvious—the alienated lands would be lost forever—and, as discussed more fully *infra,* the loss of the land itself entails a much greater injury "than possible financial loss." Were we to determine that the plaintiffs' claim for injunctive relief was not ripe, they may be left without a remedy while the corpus of the public lands trust continues to diminish, a result surely not contemplated by the Apology Resolution and our own state legislative pronouncements in Acts 354 and 359.

Moreover, were this court to grant the plaintiffs' requested injunctive relief, it would not be over-stepping "prudential rules of judicial self-governance," *Save Sunset Beach Coal.,* 102 Hawai'i at 483, 78 P.3d at 19 (original brackets omitted), because, as previously indicated, such a decision would not involve a determination whether the native Hawaiian people are entitled to ownership of the ceded lands; we need only address whether an injunction is appropriate to allow resolution of these claims without further diminishment of the trust res. As such, any injunctive relief granted by this court would allow Congress and/or the state legislature a "reasonable opportunity to craft and enforce," *id.,* relevant laws consistent with the congressional and legislative calls for reconciliation and settlement of native Hawaiian claims.

Based on the foregoing discussion, we hold that the plaintiffs' claims—to the extent they seek injunctive relief—are ripe for adjudication and, accordingly, hold that the trial court erred in determining otherwise. Because the plaintiffs' remaining claims do not necessitate a distinction between the Leiali'i parcel and the ceded lands in general, the following discussion encompasses both the Leiali'i parcel and the ceded lands in general.

### E. *Political Question*

 "The political question doctrine, often considered the most amorphous aspect of justiciability, holds generally that certain matters are political in nature and thus inappropriate for judicial review." *Nishitani v. Baker*, 82 Hawai'i 281, 290, 921 P.2d 1182, 1191 (App.1996) (citation omitted). In deciding whether the political question doctrine should be invoked, this court, in *Trustees of the Office of Hawaiian Affairs v. Yamasaki*, 69 Haw. 154, 737 P.2d 446 (1987), adopted the test recited by the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962):

> Prominent on the surface of any case held to involve a political question is found[: (1) ] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [ (2) ] a lack of judicially discoverable and manageable standards for resolving it; [ (3) ] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [ (4) ] the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; [ (5) ] an unusual need for unquestioning adherence to a political decision already made; or [ (6) ] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Yamasaki*, 69 Haw. at 170, 737 P.2d at 455 (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. 691) (format altered). The presence of any one of these six factors renders a case nonjusticiable. *Id.* Moreover, the political question

doctrine is "essentially a function of the separation of powers." *Id.* (citation omitted).

The trial court concluded that all the plaintiffs' claims were barred by the doctrine of political question. Specifically, the trial court ruled that this court has held that "the issue of whether the Territory of Hawai'i received good title to the ceded lands is a non-justiciable political question," and, as such, it was precluded from "consider[ing] the merits of [p]laintiffs' claim that the sale of ceded lands is prohibited due to a cloud on the States's title due to the illegality of the overthrow." [24]

 In challenging the trial court's ruling, the OHA plaintiffs assert that their claims do not present a non-justiciable political question because, in their view, they are "not seeking a judicial resolution of the underlying claim for a return of lands," but, instead, are asking only that this court "protect the trust assets while the dispute is being resolved by the political branches." In other words, the plaintiffs specifically assert that they are *not* "ask[ing] this [c]ourt to resolve any claim [to the ceded lands], but only to protect the trust assets that are in dispute by issuing an injunction barring the sale or transfer of the [ceded] lands. [The plaintiffs] are seeking only to have this [c]ourt protect the [c]eded [l]ands from dissipation until the political branches can reach a just solution to this dispute." In fact, the OHA plaintiffs admit that "the ultimate resolution of the [n]ative Hawaiian claims must be through the political processes, and it is actively engaged in these processes. But this struggle for justice *will be futile if the assets in disputes [i.e., the ceded lands] no longer exist when a solution is found.*" Additionally, the individual plaintiffs point out that their claims are not barred by the political question doctrine because the standards that apply to trusts provide this court with "judicially discoverable and manageable standards for resolving this issue."

The defendants maintain that the trial court correctly determined that the plaintiffs' claims presented non-justiciable political

---

**24.** As previously indicated, the trial court, nevertheless, went on to determine that the State had the legal authority to sell ceded lands.

questions inasmuch as, "[f]or nearly 100 years[,] the Hawai'i Supreme Court has foreclosed judicial inquiry into the State's title to the [c]eded [l]ands because the issue presents a political question, inappropriate for decision by the judicial branch." Moreover, the defendants argue that there are four specific reasons why the plaintiffs' claims present a non-justiciable political question: (1) "the case involves examination of questions for which there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department'"; (2) "there is a 'lack of judicially discoverable and manageable standards for resolving' this case"; (3) "the case is impossible to decide 'without an initial policy determination of a kind clearly for nonjudicial discretion'"; and (4) "[this c]ourt cannot undertake an 'independent resolution without expressing lack of the respect due coordinate branches of government.'"

The primary question before this court on appeal is whether, in light of the Apology Resolution, this court should *issue an injunction* to require the State, as trustee, to preserve the corpus of the ceded lands in the public lands trust until such time as the claims of the native Hawaiian people to the ceded lands are resolved. The important distinction here is that this court is *not* being asked to decide whether native Hawaiians are *entitled* to the ceded lands. As even the plaintiffs recognize, the "ultimate resolution of the [n]ative Hawaiian claims must be through the political process." We believe, as discussed *supra*, that the Apology Resolution—which is at the heart of the plaintiffs' claim—and the related state legislation, give rise to the State's fiduciary duty to preserve the corpus of the public lands trust, specifically, the ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved. Accordingly, we hold that the Apology Resolution and the related state legislation provide the standards needed for determining whether the *issuance on an injunction* is proper. In other words, the question before this court—whether an injunction should issue—presents a type of dispute that is traditionally resolved in the judiciary and, therefore, does not present a non-justiciable political question.

Moreover, we believe that the defendants' arguments with regard to four of the six *Baker* factors, previously enumerated, are without merit. First, this case does not involve "an examination of questions for which there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department'" inasmuch as the plaintiffs only request an injunction pending the resolution of the plaintiffs' underlying claims in the legislative process, and this court need not encroach on any issues that have been constitutionally committed to a coordinate political department in order to determine if injunctive relief is appropriate. Second, there are, as discussed *infra*, judicially manageable standards for issuing an injunction. Third, this court need not make "'an initial policy determination of a kind clearly for nonjudicial discretion'" in order to determine whether the plaintiffs' requested injunction is appropriate inasmuch as this court need only look to the Apology Resolution and, additionally, the related state legislation, as discussed *supra*. Lastly, were this court to grant the plaintiffs' requested injunctive relief, this court would not be "undertak[ing] an 'independent resolution without expressing lack of the respect due coordinate branches of government'" because, as previously indicated, the question whether an injunction is warranted in this case is the kind of question traditionally reserved for the courts.

Therefore, we agree with the plaintiffs that "the [trial c]ourt's analysis and citations miss[ed] the mark because [the plaintiffs are] not seeking a judicial resolution of the underlying claim for a return of lands, but [are] rather asking the judiciary to protect the trust assets while the dispute is being resolved by the political branches. This modest goal is well within the domain of the judiciary[.]" Accordingly, we hold the trial court incorrectly determined that the claims presented by the plaintiffs in this case—to the extent they seek injunctive relief—were barred by the political question doctrine.

## F. *The Plaintiffs' Requested Injunction*

As previously stated, the trial court—although not required—concluded that the de-

fendants had the explicit authority under the Admissions Act and the Hawai'i State Constitution to alienate the ceded lands. Having so concluded, the trial court summarily denied the plaintiffs' claim for injunctive relief, reasoning only that,

> for injunctive relief to issue on [the p]laintiffs' claim seeking a permanent injunction based on the allegation that sales of ceded lands constitute a breach of trust, [the p]laintiffs must first prevail on the merits of the underlying cause of action. The [trial] court only reaches the issue of "balance of irreparable harm" and "public interest in support" if the plaintiffs prevail on the merits.

The plaintiffs assert that the trial court erred in denying their request for injunctive relief because it was not necessary to first "resolve whether the State received 'good title' to grant injunctive relief in this case." As previously discussed, the plaintiffs' request for injunctive relief is grounded in their view that the "recognition in [the Apology Resolution and Acts 354 and 359] of the illegality of the transfer of [the ceded] lands and the ongoing reconciliation and negotiation process dramatically reinforces the State's fiduciary obligation to protect the corpus of the [p]ublic [l]and [t]rust until an appropriate settlement is reached." Additionally, the plaintiffs maintain that injunctive relief is critical to their ability to "protect the status quo before these [c]eded lands are lost and the [n]ative Hawaiian people suffer irreparable harm." The OHA plaintiffs cite to a number of international situations that they claim "illustrate[ ] that a moratorium on governmental action is appropriate to protect the rights of the natives while efforts to reach a proper settlement are underway."[25] The individual plaintiffs suggest that this court should look to general trust law for guidance in determining whether to issue an injunction and that trust law

mandates that an injunction be issued inasmuch as any sale or transfer of the illegally obtained ceded lands by the State would constitute a breach of its fiduciary duties to preserve the assets of the public lands trust until a settlement is reached.

The defendants maintain that the trial court correctly denied the plaintiffs' request for injunctive relief because the plaintiffs have not shown they can prevail on the merits. Specifically, the defendants argue that "the State has the undoubted and explicit power to sell [c]eded [l]ands pursuant to the terms of the Admission Act and pursuant to [s]tate law.[26] [The p]laintiffs have completely failed to show any basis for deviating from the terms of the trust or for finding that applicable [s]tate laws are unconstitutional or void." The defendants also argue that "the plaintiffs in our case specifically disclaim title to the [c]eded [l]ands. There simply are no 'merits' on which plaintiffs did or could prevail." The defendants further assert that "the unprecedented nature of the plaintiffs' request is highlighted by their use of the term 'moratorium.' It is not even clear whether this term is supposed to mean something different from 'injunction,' and if so, what."

■ The test for granting or denying temporary injunctive relief is three-fold: (1) whether the plaintiff is likely to prevail on the merits; (2) whether the balance of irreparable damage favors the issuance of a temporary injunction; and (3) whether the public interest supports granting an injunction. *Life of the Land v. Ariyoshi*, 59 Haw. 156, 158, 577 P.2d 1116, 1118 (1978); *see also Morgan v. Planning Dep't, County of Kauai*, 104 Hawai'i 173, 86 P.3d 982 (2004). However, as observed by the Intermediate Court of Appeals in *Penn v. Transportation Lease Hawaii, Ltd.*, 2 Haw.App. 272, 630 P.2d 646 (1981), "[t]he more the balance of irreparable

---

25. Although we recognize that international law and situations cited by the plaintiffs provide support for their requested injunction, we do not believe it is necessary to engage in a discussion of these issues inasmuch as our holding is grounded in Hawai'i and federal law.

26. The defendants assert that there are five "reasons or bases" for the State's "unchallenged power to sell" the ceded lands: (1) "enabling acts generally and historically have afforded the power to sell to new states"; (2) "the Admission Act specifically grants the power to sell"; (3) "the Hawai'i Constitution confirms the power to sell"; (4) "state statutes embody the power to sell"; and (5) "the Hawai'i Supreme Court has previously held that the State has power to sell."

damage favors issuance of the injunction, the less the party seeking the injunction has to show the likelihood of his success on the merits." *Id.* at 276, 630 P.2d at 650 (citations omitted). As pointed out by the parties and the trial court, "[n]o reported Hawai'i case discusses the requirements for entry of a permanent injunction." However, we agree with the trial court that "it is generally held that '[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.' " [27] Accordingly, we believe that the appropriate test in this jurisdiction for determining whether a permanent injunction is proper is: (1) whether the plaintiff has prevailed on the merits; (2) whether the balance of irreparable damage favors the issuance of a permanent injunction; and (3) whether the public interest supports granting such an injunction.

Thus, where a permanent injunction is sought from an appellate court, the first element of the test is necessarily concerned with whether the plaintiffs have prevailed on the merits of the appeal. *See Indian Motorcycle Assocs.,* 66 F.3d at 1249. Having held that the Apology Resolution and related state legislation give rise to the State's fiduciary duty to preserve the corpus of the public lands trust, specifically, the ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved, we believe the plaintiffs, as a matter of law, have succeeded on the merits of their claim inasmuch as any future transfer of ceded lands by the State would be a breach of the State's fiduciary duty to preserve the trust res.

Specifically, the language of the Apology Resolution itself supports the issuance of an injunction. As previously discussed, we believe, based on a plain reading of the Apology Resolution, that Congress has clearly recognized that the native Hawaiian people have unrelinquished claims over the ceded lands, which were taken without consent or compensation and which the native Hawaiian people are determined to preserve, develop, and transmit to future generations. Equally clear is Congress's "express[ed] ... commitment to acknowledge the ramifications of the overthrow of the Kingdom of Hawaii, in order to *provide a proper foundation for reconciliation* between the United States and the [n]ative Hawaiian people." Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510 (emphasis added). Accordingly, the Apology Resolution dictates that the ceded lands should be preserved pending a reconciliation between the United States and the native Hawaiian people. Without an injunction, the ceded lands are at risk of being alienated and, as previously stated, once the ceded lands are sold or transferred from the public lands trust, they will not be available to satisfy the unrelinquished claims of native Hawaiians and will, as discussed more fully *infra,* undoubtedly have a negative impact on the contemplated reconciliation efforts.

The plaintiffs' argument that an injunction is necessary to preserve the status quo pending the resolution of the native Hawaiians' claims to the ceded lands is further supported by the Justice and Interior Departments' report, entitled "From Mauka to Makai: The River of Justice Must Flow Freely." As previously stated, the report states: "As [a] matter of justice and equity, this report recommends that [n]ative Hawaiian people should have self-determination over their own affairs within the framework of [f]ederal law, as do Native American tribes." (Format altered.) (Emphases added.) Moreover, the Departments asserted that, "[t]o safeguard and enhance [n]ative Hawaiian self-determination over their lands, cultural resources, and internal affairs, the Departments believe Congress should enact further legislation to clarify [n]ative Hawaiians' political status and to create a framework for recognizing a gov-

---

27. *See, e.g., Indian Motorcycle Assocs. III Ltd. P'ship v. Massachusetts Housing Fin. Agency,* 66 F.3d 1246, 1249 (1st Cir.1995):

Four principal factors govern the appropriateness of permanent injunctive relief: (1) whether the plaintiff has prevailed on the merits; (2) whether the plaintiff will suffer irreparable injury absent injunctive relief; (3) whether the harm to the plaintiff outweighs any harm threatened by the injunction; and (4) whether the public interest will be adversely affected by the injunction.

(Internal quotations marks and citation omitted.)

ernment-to-government relationship with a representative [n]ative Hawaiian governing body."

More importantly, the state legislature itself has announced that future reconciliation between the State and native Hawaiians will occur. The Hawai'i legislature, in Acts 359 and 329, discussed *supra*, recognized that "the indigenous people of Hawai'i were denied ... their lands," 1993 Haw. Sess. L. Act 359, § 1(9) at 1010 (creating a Hawaiian Sovereignty Advisory Commission), and contemplated further action by the legislature to reach a "lasting reconciliation so desired by all people of Hawai'i." 1997 Haw. Sess. L. Act 329, § 1 at 956. Although Act 359, which created the Hawaiian Sovereignty Advisory Commission, did not specifically address the issue of native Hawaiians' title to ceded lands, the stated purpose of the Act was to "facilitate the efforts of native Hawaiians to be governed by an indigenous sovereign nation of their own choosing." 1993 Haw. Sess. L. Act 359, § 2 at 1010. As previously stated, Act 354 recognized that "[m]any native Hawaiians believe that the lands taken without their consent should be returned and if not, monetary reparations made, and that they should have the right to sovereignty, or the right to self-determination and self-government as do other native American peoples." 1993 Haw. Sess. L. Act 354, § 1 at 1000. Moreover, the legislature "acknowledged that the actions by the United States were illegal and immoral, and pledge[d] its continued support to the native Hawaiian community by taking steps to promote the restoration of the rights and dignity of native Hawaiians." *Id.* Additionally, in Act 329, the legislature indicated that it was moving "*toward a comprehensive, just, and lasting resolution*" regarding native Hawaiian claims to the ceded lands. 1997 Haw. Sess. Law. Act 329, § 1 at 956 (emphasis added).

The governor, herself, has indicated her commitment—and, by association, that of the executive branch—to settling the native Hawaiians' claims to the ceded lands. On January 21, 2003, in her "State of the State Address," Governor Lingle stated, "Here at home in Hawai'i[,] I will continue to work with you [*i.e.*, the members of the legislature]

and with the Hawaiian community to resolve the ceded lands issue once and for all." Linda Lingle, Governor, State of Hawai'i, *State of the State Address: An Outline of the Governor's Agenda* (Jan. 21, 2003).

Also, as previously noted, testimony was adduced at trial that the State has been following a self-imposed moratorium since 1994 on the sales of ceded lands until a resolution of the present lawsuit. Such a self-imposed moratorium leads to an inference that questions regarding the title to the ceded lands exist and, additionally, that the State is apparently able to comply with its duties as public lands trustee without having to alienate the ceded lands.

In sum, all of the aforementioned pronouncements indicate that the issue of native Hawaiian title to the ceded lands will be addressed through the political·process. In this case, Congress, the Hawai'i state legislature, the parties, and the trial court all recognize (1) the cultural importance of the land to native Hawaiians, (2) that the ceded lands were illegally taken from the native Hawaiian monarchy, (3) that future reconciliation between the state and the native Hawaiian people is contemplated, and, (4) once any ceded lands are alienated from the public lands trust, they will be gone forever. For present purposes, this court need not speculate as to what a future settlement might entail—*i.e.*, whether such settlement would involve monetary payment, transfer of lands, ceded or otherwise, a combination of money and land, or the creation of a sovereign Hawaiian nation; it is enough that Congress, the legislature, and the governor have all expressed their desire to reach such a settlement. In other words, the aforementioned pronouncements as they relate and impact the plaintiffs' claim for injunctive relief clearly support the plaintiffs' position that the State has a fiduciary duty as trustee to protect the ceded lands pending a resolution of native Hawaiian claims. As such, we believe that the plaintiffs have met the first prong of the three-part test for issuance of a permanent injunction, *i.e.*, prevailing on the merits of their claim.

The second prong of the test for an injunction is whether "the balance of irreparable

damage favor[s] the issuance of a temporary injunction." *Life of the Land*, 59 Haw. at 158, 577 P.2d at 1118. Obviously, without an injunction, any ceded lands alienated from the public lands trust will be lost and will not be available for the future reconciliation efforts contemplated by the Apology Resolution, Acts 354, 359, and 329, and Governor Lingle. Although an argument could be made that monetary reparations would be the logical remedy for such loss, we are keenly aware—as was Congress—that "the health and well-being of the [n]ative Hawaiian people is intrinsically tied to *their deep feelings and attachment to the land*[.]" Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510 (emphasis added). Indeed, as more eloquently stated by the trial court:

> The [n]ative Hawaiian [p]eople continue to be a unique and distinct people with their own language, social system, ancestral and national lands, customs, practices and institutions. "The health and well-being of the [n]ative [H]awaiian people is intrinsically tied to their deep feelings and attachment to the land." [ (Citing in a footnote to the Apology Resolution.) ] *'Aina, or land, is of crucial importance to the [n]ative Hawaiian [p]eople—to their culture, their religion, their economic self-sufficiency and their sense of personal and community well-being. 'Aina is a living and vital part of the [n]ative Hawaiian cosmology, and is irreplaceable.* The natural elements—land, air, water, ocean—are interconnected and interdependent. *To [n]ative Hawaiians, land is not a commodity; it is the foundation of their cultural and spiritual identity as Hawaiians.* The 'aina is part of their 'ohana, and they care for it as they do for other members of their families. *For them, the land and the natural environment is alive, respected, treasured, praised, and even worshiped.*

(Footnotes omitted.) (Emphases added.)

Moreover, testimony adduced at trial further supports and underscores the importance of the land to native Hawaiians and to their continued "cultural identity ... spiritual and traditional beliefs, customs, practices, language, and social institutions," Apology Resolution, Pub.L. No. 103–150, 107 Stat. 1510, as well as the historical and cultural reasons therefor. For example, David H. Getches, a professor at the University of Colorado School of Law, was called to testify as the plaintiffs' expert. Getches testified that he was a member of the editorial board for the 1982 edition of the *Felix Cowen's Handbook of Federal Indian Law,* considered "one of the leading treatises on Indian law," and authored the chapter on native Hawaiians. He was qualified as an expert in the field of "natural resources law," without objection. With regard to the ceded lands, Getches testified:

> Q [By plaintiffs' counsel] You have said that preventing ceded lands from being transferred would keep the claims situation from becoming more complicated, preserve flexibility, and be consistent with the intent of Congress and the state legislature. Based on your knowledge of the history of native Hawaiian claims[,] what is so special about these lands?

> A [By Getches] I think that *what is special about these claims is that this is land that has a pedigree tracing back to a disposition of the Hawaiian people at the time of the overthrow.* This is highly unusual to be able to trace this much land still in public ownership back to the time of dispossession, the very root of these claims.

> Secondly, this is land which my understanding is has been traditionally used in some places by native people for traditional purposes.

> Third, *it is land that was granted to the State only on specific conditions that demand fiduciary responsibility.* So there is certainly something special about those lands when it comes to their use and disposition in the future.

> Further, I think that it is notable that the objection to the use of these lands is coming now by the only legally constituted voice for the present day successors to the people who were dispossessed. *This is a remarkable claim in this case.* And I think those reasons all support the conclusion that there is something special about these lands.

> . . . .

Q Can a political entity have governance without having any territory?

A *It is very difficult to have sovereignty without land.* There are some exceptional examples. Israelites before there was an Israel had a notion of governance. It is very difficult for a government to operate without territorial boundaries.

Q Is governance important? Is land important to native people for cultural survival as well?

A Yes. As I indicated, there are traditional uses of land, and in particular the land you were asking me about, that make it especially important. Land generally for native people—I am now speaking based on my knowledge of Indian tribes throughout the United States and the ones I have worked with—*land is generally extremely important as the very root of their culture. It is the homeland. It provides the basis for self determination, self expression. It is a source of identity. Who we are. As a people.* As people have said it to me. *It is a connection,* as well, *to one's cultural roots,* going back to the ancestors that can be felt and who were known and the ancestors who were unknown and exist only in the spiritual world. That connects present day communities with one another, within those cultural roots. So *the land is symbolic* for that, whether it is for burial places or just the feeling that this is the place of importance.

Finally, *it is important for spiritual fulfillment, something we as non native people don't feel, is the importance of place in a spiritual way.* I love certain places that I go and some that I own. But it is really quite different, having the land, water, nature connection that native people have. *I don't like generalizations* about native groups. And what is common among them. *This is the only generalization I have found in over thirty-some years that holds up, that is, that there is a special spiritual connection with land among all native groups that I know.*

(Emphases added.)

Olive Kanahele was called as a witness by the plaintiffs. She holds a bachelor of arts degree in Hawaiian Studies and is a "kumu hula" or dance teacher. In addition to teaching dance, *i.e.,* the hula, Kanahele described learning about ancient Hawaiian chants and testified specifically regarding chants that tell the story of Pele and Hiiaka, deities of the life cycle. According to Kanahele,

> Pele comes and she erupts and her lava goes all over the lands and also extends land. And Hiiaka comes along and her function as the egg child ... is to allow things to grow on the land. And so she's the healer of the family and she heals the lands and things begin to grow. And as the things begin to grow, then it becomes suitable for ... humans ... to live on.

When asked about "the land," Kanahele testified:

> The land itself ... is the deity, Pele. The land itself was made from fire and it comes from out of the earth. And, you know, I can give you a little geneaology [sic] of the Pele family. The Pele family comes from—the mythological geneaology [sic] of the Pele family is that the mother is Haumea, she is the Mother Earth, she is the earth and all of these children are born from different parts of her.
>
> ....
>
> Pele ... is born from the natural channel of a female, she comes from the womb. And so ... her responsibility is to go back into the womb of the mother and—and bring out all of these things that we call land, that we call magma and lava and eventually will become land.
>
> One of the—one of the most amazing literary work that we have is the kumulipo.... The kumulipo spans generations of people.... And the first era of the kumulipo, the very first line of the kumulipo talks about the making of the earth....
>
> ....
>
> ... And why does it have to be earth, you ask me?
>
> ....
>
> It has to be earth because as man we need—we need land to live on. That is—that is our foundation. *And for the native Hawaiian, more than the family, land is their foundation. Land is their identity.*

(Emphases added.) Based on the foregoing, we believe the second prong of the test for an injunction, *i.e.*, irreparable damage, has been met. *Life of the Land*, 59 Haw. at 158, 577 P.2d at 1118.

The last prong of the test for an injunction is whether "the public interest supports granting an injunction." *Id.* Here, we need look no further than the legislative pronouncement contained in Act 329, declaring that a "lasting reconciliation [is] desired by all people of Hawai'i," 1997 Haw. Sess. L. Act. 329 § 1 at 956, to conclude that the public interest supports granting an injunction.

We firmly believe that, given the "crucial importance [of the 'aina or land to] the [n]ative Hawaiian people and their culture, their religion, their economic self-sufficiency, and their sense of personal and community well-being," any further diminishment of the ceded lands (the 'aina) from the public lands trust will negatively impact the contemplated reconciliation/settlement efforts between native Hawaiians and the State.

■ It is well-settled that a "[s]ettlement is an agreement to terminate, by means of mutual concessions, a claim that is disputed in good faith ... and is designed to prevent or put at end to litigation." *Rearden Family Trust v. Wisenbaker*, 101 Hawai'i 237, 251, 65 P.3d 1029, 1043 (2003) (internal quotation marks, original brackets, citation, and footnote omitted). The continued diminishment of the public lands trust means that any land sold or transferred to third parties will be lost and, thus, unavailable for settlement purposes. As such, native Hawaiians would be placed in an unfair and disadvantaged position inasmuch as they may, ultimately, be forced to accept less-than-desirable settlement terms and make concessions that they would not have otherwise made had certain ceded lands, for example, been kept in the public lands trust. Moreover, the State, acting as both the trustee of the land (with the power to alienate it) and a major participant in the negotiation process, would be in a more advantageous position and have greater bargaining power. In our view, enjoining the defendants from selling or otherwise transferring to third parties any ceded lands from

the public land trust until the claims of the native Hawaiians to those lands are resolved and, thus, preserving the status quo and the trust res, would help in leveling the playing field during the pendency of settlement negotiations and reconciliation process contemplated by the Apology Resolution and related state legislation discussed *supra. Cf. Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618 (2005) (finding lost opportunity to compete for contract on level playing field sufficient to constitute irreparable harm for purpose of issuing temporary restraining order); *Regal–Beloit Corp. v. Drecoll*, 955 F.Supp. 849, 867 (N.D.Ill.1996) (injunction issued to level the playing field of the parties).

Finally, as indicated by the plaintiffs, their request for an injunction is further supported by the United States Supreme Court's decision in *Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1919). In *Lane*, the plaintiff, "an Indian town," brought a claim seeking to enjoin certain governmental officials from "offering, listing, or disposing of certain lands in southern Arizona as public lands of the United States." 249 U.S. at 111, 39 S.Ct. 185. The plaintiffs alleged two grounds for their suit: (1) "that under the laws of Spain and Mexico it had, when that region was acquired by the United States, and under the provisions of the treaty it now has, a complete and perfect title to the lands in question"; and (2) "that in disregard of its title the defendants are threatening and proceeding to offer, list and dispose of these lands as public lands of the United States." *Id.* The court "of first instance" granted the defendants' motion to dismiss. *Id.* On appeal, the Court of Appeals of the District of Columbia held that the plaintiff's claims entitled it to relief and granted its requested permanent injunction. *Id.* The defendants challenged the Court of Appeals' decision. Although, ultimately determining that the Court of Appeals should not have granted the permanent injunction because that proceeding did not afford the defendants the opportunity to answer the merits, the Court observed:

The defendants assert with much earnestness that the Indians of this pueblo are

wards of the United States—recognized as such by the legislative and executive departments—and that in consequence the disposal of their lands is not within their own control, but subject to such regulations as Congress may prescribe for their benefit and protection. Assuming, without so deciding, that this is all true, we think it has no real bearing on the point we are considering. Certainly[,] it would not justify the defendants in treating the lands of these Indians—to which, according to the bill, they have a complete and perfect title, as public lands of the United States and disposing of the same under the public land laws. *That would not be an exercise of guardianship, but an act of confiscation. Besides, the Indians are not here seeking to establish any power or capacity in themselves to dispose of the lands, but only to prevent a threatened disposal by administrative officers* in disregard of their full ownership. Of their capacity to maintain such a suit we entertain no doubt. The existing wardship is not an obstacle, as is shown by repeated decisions of this court[.]

*Lane,* 249 U.S. at 113, 39 S.Ct. 185 (emphasis added) (footnote omitted). The Court held that

"the decrees of both courts below should be reversed and the case remanded to the court of first instance, with direction to overrule the motion to dismiss, to afford the defendants an opportunity to answer the bill, [and] *to grant an order restraining them from in any wise offering, listing or disposing of any of the lands in question pending the final decree* [ ]."

*Id.* at 114, 39 S.Ct. 185 (emphasis added).

As the defendants in this case point out, the facts in the instant case differ from those in *Lane* inasmuch the plaintiffs do not assert that they have "complete and perfect title" and do not "seek judicial resolution of any controversy," as well as the fact that *"Lane* considered only the executive branch's power to deal with Indian land." Nevertheless, *Lane* is instructive to the extent that it demonstrates the Court's rationale for ordering that injunctive relief be granted pending a final resolution of claims. The fact that *Lane*

involved a judicial resolution for a controversy versus a legislative resolution as in the instant case is, in our view, a distinction without a difference.

Based on the foregoing discussion, we conclude that the plaintiffs have established that injunctive relief is proper pending final resolution of native Hawaiian claims through the political process. Accordingly, we hold that the trial court erred in denying the plaintiffs' request for injunctive relief.

### G. *The Plaintiffs' Remaining Contentions*

In light of the above discussion, we need not address the OHA plaintiffs' remaining contentions regarding declaratory relief or certain evidentiary rulings made by the trial court.

### IV. CONCLUSION

Based on the foregoing, we hold that: (1) the Apology Resolution and related state legislation, give rise to the State's fiduciary duty to preserve the corpus of the public lands trust, specifically, the ceded lands, until such time as the unrelinquished claims of the native Hawaiians have been resolved; (2) the trial court correctly determined that this court's unpublished decision in *Trustees of the Office of Hawaiian Affairs v. Board of Land and Natural Resources,* No. 19774, 87 Hawai'i 471, 959 P.2d 841 (Haw. Mar. 12, 1998) (mem.), did not collaterally estop the plaintiffs' claims in this case inasmuch as the elements of collateral estoppel, *see Keahole Def. Coal., Inc. v. Bd. of Land & Natural Res.,* 110 Hawai'i 419, 429, 134 P.3d 585, 595 (2006), are not present; (3) the plaintiffs' claim for injunctive relief with regard to the Leiali'i parcel is not barred by sovereign immunity based on our conclusion that the $31 million expenditure on infrastructure for the Leiali'i parcel had only an ancillary effect—albeit a substantial one—on the state treasury, *see Kaho'ohanohano v. State,* 114 Hawai'i 302, 337, 162 P.3d 696, 731 (2007); (4) inasmuch as the Apology Resolution and related state legislation give rise to a fiduciary duty by the State, as trustee, to preserve the corpus of the public lands trust until such time as the unrelinquished claims of the native Hawaiians have been resolved, the trial

218

court's conclusion that OHA's actions between 1987 and 1994 constituted a waiver of the plaintiffs' claims was clearly erroneous and, therefore, the plaintiffs did not waive their claim for injunctive relief with regard to the Leiali'i parcel; (5) the plaintiffs were not estopped from challenging the transfer of the Leiali'i parcel based on their pre–1993 actions because it was not until the Apology Resolution was signed into law on November 23, 1993 that the plaintiffs' claim regarding the State's explicit fiduciary duty to preserve the corpus of the public lands trust arose; (6) inasmuch as the plaintiffs' requested relief is clearly prospective in nature, the plaintiffs' claims with regard to the sale or transfer of the ceded lands in general are not barred by sovereign immunity; (7) the question whether an injunction is appropriate to allow resolution of the plaintiffs' unrelinquished claims without further diminishment of the trust res is ripe for adjudication; (8) the question whether an injunction should issue presents a type of dispute that is traditionally resolved by the courts and, therefore, does not present a non-justiciable political question; (9) the appropriate test in this jurisdiction for determining whether a permanent injunction is proper is: (a) whether the plaintiff has prevailed on the merits; (b) whether the balance of irreparable damage favors the issuance of a permanent injunction; and (c) whether the public interest supports granting such an injunction; and (10) the plaintiffs have established that injunctive relief is proper pending final resolution of native Hawaiian claims through the political process.

Accordingly, we vacate the trial court's January 31, 2003 judgment and remand this case to the circuit court with instructions to issue an order granting the plaintiffs' request for an injunction against the defendants from selling or otherwise transferring to third parties (1) the Leiali'i parcel and (2) any other ceded lands from the public lands trust until the claims of the native Hawaiians to the ceded lands have been resolved.

